1998-NMCA-150

968 P.2d 334

**STATE of New Mexico, Plaintiff–Appellee,**

v.

**Wayne A. JUTTE, Defendant–Appellant.**

**No. 18,572.**

Court of Appeals of New Mexico.

Aug. 11, 1998.

Certiorari Denied, No. 25,349, Oct. 14, 1998.

Tom Udall, Attorney General, Steven S. Suttle, Assistant Attorney General, Santa Fe, for Appellee.

Paul J. Kennedy, Albuquerque, for Appellant.

## OPINION

BOSSON, J.

{1} In this case we determine how long and under what conditions a commercial truck may be detained at a roadside weigh station before a routine, regulatory stop ripens into an unlawful de facto arrest that may vitiate a subsequent consent to search. Because we conclude under the circumstances of this case that Defendant was unreasonably and unlawfully detained before he consented to a search of his truck, we conclude that Jutte's motion to suppress should have been granted, and accordingly, we reverse the decision of the district court to the contrary.

## BACKGROUND

{2} On May 21, 1996, at 7:30 a.m., Defendant Wayne Jutte pulled his commercial truck into what is called a portable port of entry (a portable weigh station), which was set up by the New Mexico Motor Transportation Division (MTD) in Chaves County about twelve miles west of Roswell on U.S. 70. All commercial vehicles were required to stop at this port of entry, but not all were checked

thoroughly because of the volume of traffic. *See* NMSA 1978, § 65-1-11 (1992) (authorizing port of entry stops of commercial trucks). The MTD officers were stationed there to weigh the trucks, to check the drivers' records and licenses, and to make sure the loads were secure. They also performed commodity inspections, checked the vehicle equipment, and verified the cargo against the load bill.

{3} Jutte produced his license and log book for inspection at the request of the MTD officer, Officer Langehennig, who asked Jutte where he was coming from and what his destination was. Jutte responded that he had come from Tucson, where he had been visiting friends, and was returning home to Ohio. Jutte told Officer Langehennig that he was not carrying a commercial load and therefore had no load bill, but he was carrying two motorcycles that belonged to him. Jutte produced proof of ownership for the motorcycles.

{4} Within approximately five minutes after Jutte had first stopped at the weigh station, Officer Langehennig had completed weighing the truck, but he nonetheless asked Jutte to pull over into the secondary inspection area. In court, Officer Langehennig subsequently explained that he wanted to confirm ownership of the motorcycles by further investigation. The officer also acknowledged that he thought it was odd that a commercial vehicle would be traveling so far without a load, and this aroused his suspicion. At around this same time, Officer Langehennig asked another officer at the weigh station to call the Roswell office for drug dogs. Upon request, Jutte produced two Ohio registrations for the motorcycles, and he and Officer Langehennig went to the back of the trailer to compare them with the motorcycles. Upon looking inside the trailer, the officer saw the two motorcycles as well as a pickup truck, which Jutte had not disclosed. Jutte explained that he had taken the motorcycles with him to Tucson so that he could get around while he was there, and he told Officer Langehennig that the pickup belonged to his passenger, John Holden. Both of the registrations on the motorcycles matched the license plates, but the vehicle identification number (VIN) on one of the registrations did not match the VIN on the motorcycle.

{5} Officer Langehennig then asked to see the passenger, Holden, who was in the sleeping compartment of the tractor. Holden had recently bought the pickup, and he showed Officer Langehennig the title. The two entered the truck to verify that the VIN on the pickup matched the VIN on the title. However, the title to the pickup was not in Holden's name, and Holden had not obtained a bill of sale from the seller. Officer Langehennig then turned the vehicle registrations over to another officer to check with the National Crime Information Center (NCIC) whether the motorcycles and the pickup had been reported stolen. Shortly thereafter, the NCIC search on the motorcycles and the pickup came back negative. However, Jutte and Holden were not allowed to leave because they could not prove to Officer Langehennig's satisfaction that they owned these vehicles. According to the officers, the NCIC search only verified the lack of any report of stolen vehicles; it did not confirm rightful title in these individuals and it did not dispel their suspicion.

{6} Even though Jutte was not hauling a commercial load and had no load bill against which to verify the cargo, Officer Langehennig testified that he believed that it was part of his duties as a MTD officer to verify "the load" by confirming ownership. There was no testimony, however, as to what procedures would be followed to verify ownership once the NCIC search failed to confirm the officer's suspicion that the vehicles might be stolen. There was no testimony outlining how either Jutte or the officers were going to confirm or dispel suspicion of vehicular theft. Officer Langehennig also testified that he intended to keep Jutte at the weigh station until the drug dogs arrived, which made it apparent that Jutte was under suspicion for illegal drugs as well as transportation of stolen vehicles.

{7} Sometime between 8:00 a.m. and 8:30 a.m., the MTD supervisor, Lieutenant Walker, arrived at the weigh station from Roswell and met with the officers. He asked if a consent-to-search form had been filled out,

and was told that one had been filled out, but that Jutte had not yet signed it. Lieutenant Walker testified that the vehicles were being held because of problems with verifying ownership of the pickup. Lieutenant Walker told Jutte that he wanted his consent to search the truck so that they could "explore the items further." Lieutenant Walker also told Jutte that he thought there may be other items that Jutte was not being truthful about—either money or drugs. The lieutenant testified that when someone does not have the proper paperwork on a vehicle, "or an alternate identification number, you can hold it [the vehicle without the proper paperwork] up to, I believe, seven days or thereabouts until you can identify the ownership and verify the vehicle is not stolen." Lieutenant Walker stated that until the officers "could verify the problem with the vehicles in the trailer," the tractor-trailer would have been held "till we could clear that issue." Contrary to Officer Langehennig's testimony, however, Lieutenant Walker testified that Jutte and Holden were free to leave "because there was nothing to detain them on."

{8} At 8:30 a.m., an hour after Jutte had first pulled into the weigh station, Lieutenant Walker obtained Jutte's consent to search. There was no evidence of overt coercion and the district court so found. At this point both Jutte and Holden were placed in police cars, although they were not formally placed under arrest. Approximately one hour later, illegal drugs were found in the tractor-trailer after the speakers had been removed with power tools. At 10:30 a.m., the truck was driven to Roswell for a more extensive search.

{9} Jutte raises two issues on appeal: (1) whether the roadblock was unlawfully conducted because the field officers had unlimited discretion about whom to stop and pull over to the secondary inspection area, and (2) whether his detention for one hour constituted a de facto arrest that contaminated Jutte's consent to search the tractor-trailer.

## DISCUSSION

{10} Jutte argues that the evidence should be suppressed because the stop was illegal and the consent to search was contaminated by his prolonged detention that ripened into a de facto arrest, made without probable cause or exigent circumstances. The State, on the other hand, claims that the weigh station stop was authorized by statute and passes constitutional muster because it was conducted as part of a highly-regulated commercial activity in which truck drivers do not have the same expectation of privacy as do drivers of personal cars not holding a commercial license. The State also contends that the consent to search is valid because it was voluntarily given. We first address the question of whether the initial stop and the move to the secondary inspection area constituted an unreasonable search and seizure.

## The Initial Stop and the Initial Secondary Inspection were Reasonable

{11} Jutte first argues that the initial stop of his commercial vehicle was unlawful because the field officers had unlimited discretion over whom they would stop and whom they would pull over into the secondary inspection area. Under NMSA 1978, § 65-5-1 (1983), all commercial motor vehicles are required to stop at every port of entry designated by MTD inspectors. Additionally, Section 65-1-11 provides that ports of entry can be either temporary or permanent. In *State v. Clark*, 112 N.M. 500, 501-02, 816 P.2d 1122, 1123-24 (Ct.App.1991), this Court held a MTD stop unconstitutional when an inspector stopped vehicles randomly, at his own discretion, and not at a designated port of entry. We observed that "in the absence of reasonable suspicion, stops must be carried out pursuant to a plan which embodies explicit, neutral limitations on the conduct of individual officers." *Id.* at 501, 816 P.2d at 1123.

{12} Unlike the stop in *Clark*, however, the stop in this case was made at a designated port of entry, and there is no dispute that the MTD inspectors required all commercial vehicles to enter the weigh station. Officer Langehennig testified that the decision to have Jutte pull over to the secondary inspection area was made to get the truck out of the line of traffic while he checked the registrations of the motorcycles. This kind of administrative stop, which applies equally to all commercial vehicles, is conducted accord-

ing to a statutory scheme " 'embodying explicit, neutral limitations on the conduct of individual officers.' " *State v. Creech,* 111 N.M. 490, 493, 806 P.2d 1080, 1083 (Ct.App. 1991) (quoting *Brown v. Texas,* 443 U.S. 47, 51, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979)). Thus, it has been held that "[t]he brief weighing detention undertaken does not result in a search of either the vehicle or its driver and in light of the regulatory need for it, is valid under the Fourth Amendment." *United States v. Rivera–Rivas,* 380 F.Supp. 1007, 1009 (D.N.M.1974). In that opinion, the federal court noted that "[t]he Fourth Amendment is satisfied because a reasonable regulatory purpose is being furthered, the intrusion is necessary to further the regulatory purpose, and the invasion to privacy is minimal." *Id.* at 1010.

■ {13} Jutte contends that *City of Las Cruces v. Betancourt,* 105 N.M. 655, 735 P.2d 1161 (Ct.App.1987) is controlling in this case, and that the extent of officer discretion over who should be detained in the secondary inspection area makes the stop illegal. We disagree. *Betancourt* does not control because the case before us involves a routine stop and inspection of all commercial vehicles in a highly-regulated industry. *Betancourt* addresses the reasonableness of roadblocks that stop private citizens without reasonable suspicion and that are unsupported by the presumption of legitimacy that is inherent in government regulation of commercial activity. *See id.* at 658–59, 735 P.2d at 1164–65. In the context of a closely regulated industry like the commercial trucking industry, the regulatory means of stopping and briefly detaining all or nearly all commercial vehicles advances legitimate regulatory purposes which renders the stop reasonable. *See Missouri v. Rodriguez,* 877 S.W.2d 106, 109 (Mo. 1994) (en banc) ("[P]ermanent checkpoints at which all or nearly all of the commercial vehicles are required to submit to weighing and inspection constitute reasonable seizures[.]"). Thus, we disagree with Jutte's contention that the initial stop and referral to the secondary inspection area were unreasonable under the United States Constitution.

**The Initial Lawful Detention Ripened Into an Unlawful De Facto Arrest**

■ {14} This Court has previously stated in *State v. Flores,* 1996–NMCA–059, ¶ 15, 122 N.M. 84, 920 P.2d 1038, that "[w]hen a detention exceeds the boundaries of a permissible investigatory stop, it becomes a de facto arrest requiring probable cause." There is no basis for contending that the officers had probable cause to support an arrest prior to the search. Therefore, if Jutte's detention constituted a de facto arrest prior to the search, then that arrest was unlawful and it may have tainted his consent to the search.

{15} Recently, in *State v. Hernandez,* 1997–NMCA–006, ¶¶ 22–36, 122 N.M. 809, 932 P.2d 499, this Court addressed the issue of when a consent to search is rendered invalid by an extended detention without probable cause. We acknowledged in *Hernandez* that there is no bright-line test pinpointing the moment when a detention becomes a de facto arrest, but that " 'we must apply a balancing test in which the Court weighs "both the character of the official intrusion [on the person's liberty] and its justification." ' " *Id.* ¶ 23 (quoting *Michigan v. Summers,* 452 U.S. 692, 701, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981)). We observed that our Supreme Court has identified three factors to consider when balancing the intrusion against the justification: "length of the detention, place of the detention, and restriction on the defendant's freedom of movement." *Id.* ¶ 24 (citing *State v. Werner,* 117 N.M. 315, 318, 871 P.2d 971, 974 (1994)). In *Hernandez,* we concluded that holding a female suspect at a border checkpoint for two hours while awaiting the arrival of a female agent to perform a strip search, constituted a significant intrusion on personal liberty, and thus it was a de facto arrest under *Werner* which required probable cause. *See id.,* 1997–NMCA–006, ¶ 24. The de facto arrest tainted an otherwise uncoerced consent to search, and the evidence was ordered suppressed. *See id.* ¶ 36.

{16} The State attempts to justify the reasonableness of holding Jutte for an hour by arguing that the average wait at a weigh station lasts approximately forty-five min-

utes, and thus a one-hour wait is only marginally longer and not unreasonable when taken in context. The facts of this case, however, demonstrate that this was not an average inspection and would not ordinarily have required anything close to that much time. Jutte was not carrying a commercial load that would have required inspection. He was transporting two motorcycles and a pickup truck, none of which was reported stolen on the NCIC search. There was no evidence that the NCIC search required a full hour or even close to that amount of time; to the contrary, it appears to have been completed in a matter of minutes. We do not doubt that in some circumstances involving large loads that require time-consuming inspections, an hour-long regulatory detention might be reasonable, but under the facts of this case, Jutte should have been detained no longer than it took to receive and analyze the NCIC reports, so as to confirm or dispel the officers' initial suspicion of stolen vehicles.

{17} The State contends that Jutte was not subjected to a de facto arrest because he was free to leave during this hour-long investigation. The State relies on *Ohio v. Robinette*, 519 U.S. 33, 117 S.Ct. 417, 421, 136 L.Ed.2d 347 (1996) for the principle that the Fourth Amendment does not require that a suspect be told he is free to leave as a condition precedent to a valid consent to search. We note that there was conflicting testimony at trial over whether Jutte and Holden were free to leave, and that the district court concluded: "Given the isolated location of the port of entry, I conclude that Defendant was not free to leave the scene." As the State reminds us, this Court must give deference to the factual findings of the district court while conducting a de novo review of the lower court's application of the law to the facts. *See Flores*, 1996–NMCA–059, ¶ 6; *see also Connecticut v. Ostroski*, 186 Conn. 287, 440 A.2d 984, 986 (Conn.1982) (concluding defendant separated from his car was not free to leave). We agree with the district court that, as a practical matter, Jutte was not free to leave given detention in such an isolated area. In analyzing the reasonableness of the detention, this weighs against the State in terms of the "place of

the detention, and restriction on the defendant's freedom of movement." *Hernandez*, 1997–NMCA–006, ¶ 24.

{18} The significance of the intrusion upon Jutte's liberty must be balanced against the weight of the "government's justification for the intrusion." *Werner*, 117 N.M. at 318, 871 P.2d at 974. As we discussed earlier, the regulatory purposes of weighing and inspecting trucks initially justify the State's actions in stopping and checking commercial vehicles. However, in evaluating the justification for the length of the detention, we noted in *Hernandez* that the state's diligence in verifying or dispelling suspicion during detention is particularly significant:

> Diligence in the investigation is key, and the expansion of the investigation to look, search, or fish elsewhere is not contemplated for investigatory stops. The concept of diligence has an aspect of speed or haste. As soon as the investigation requires awaiting the development of circumstances off the scene, the validity of the investigatory stop becomes suspect.

*Hernandez*, 1997–NMCA–006, ¶ 25 (quoting *Werner*, 117 N.M. at 319, 871 P.2d at 975).

{19} After questioning Jutte and Holden, inspecting their registration and title documents as well as the vehicles' license plates and VINs, and receiving the NCIC report, the officers had exhausted the means of investigation by which they could confirm or dispel their suspicions quickly. *See United States v. Sharpe*, 470 U.S. 675, 686, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985) ("In assessing whether a detention is too long in duration to be justified as an investigatory stop, we consider it appropriate to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant."). The investigation failed to establish probable cause that the vehicles were stolen. Although there was testimony at the hearing on the motion to suppress that the MTD officers believed they were authorized to impound the tractor-trailer at this point, the Attorney General has cited no authority to support this claim. Thus, once the reports

from NCIC could not confirm that the vehicles in question were stolen, the officers had no reasonable basis to detain Jutte or Holden any longer on suspicion of vehicle theft.

{20} Neither can we approve of Jutte's detention solely on the grounds that the drug dogs had not yet arrived. The inspectors may have initially suspected illegal possession of drugs, but they had no reasonable articulable basis for such suspicion. Under *Hernandez*, the inspectors could not justify detaining Jutte and Holden for an hour for the dogs to arrive, merely on the unsubstantiated whim that something might turn up. Seen from whatever angle, this detention constitutes an unlawful de facto arrest which the constitution simply does not permit.

### The "Fruit of the Poisonous Tree" Doctrine Requires Suppression of the Evidence

■ {21} Jutte contends that a de facto arrest without probable cause contaminates the consent and requires the suppression of any evidence discovered as a result of that consent. The State argues that the consent was voluntary and not coerced and therefore the evidence should be admitted. This argument, however, does not respond directly to Jutte's claim that the consent was tainted by the unlawful arrest. This Court observed in *State v. Bedolla*, 111 N.M. 448, 455, 806 P.2d 588, 595 (Ct.App.1991), that under *Brown v. Illinois*, 422 U.S. 590, 602, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975), the Fifth Amendment voluntariness analysis is separate from the Fourth Amendment fruit of the poisonous tree analysis. These two tests are not identical, and "evidence obtained by the purported consent should be held admissible only if it is determined that the consent was *both* voluntary and not an exploitation of the prior illegality." 3 Wayne R. LaFave, *Search and Seizure* § 8.2(d), at 656 (3d ed.1996).

■ {22} The fruit of the poisonous tree doctrine bars the admission of evidence obtained after an illegal arrest or detention except in very limited circumstances. *See* *Bedolla*, 111 N.M. at 454, 806 P.2d at 594. If there is a break in the causal chain from the unlawful arrest to the search, then the evidence may be admitted. *Id.* at 454–55, 806

P.2d at 594–95 (citing *Brown*, 422 U.S. at 601–02, 95 S.Ct. 2254). A valid consent removes the taint of an illegal detention only if there was "sufficient attenuation ... between the ... detention[ ] and the consent to search[.]" *Id.* at 453, 806 P.2d at 593. To determine whether there was "sufficient attenuation," we consider the temporal proximity of the arrest and the consent, the presence of intervening circumstances, and the flagrancy of the official misconduct. *See* *Hernandez*, 1997–NMCA–006, ¶ 31.

{23} In this case there was no attenuation to break the causal chain. Jutte was unreasonably detained, resulting in a de facto arrest without probable cause. Officer Langehennig testified that he intended to keep Jutte at the weigh station until the drug dogs arrived, and Lieutenant Walker told Jutte, while he was being detained, that he would like to obtain Jutte's consent to search his vehicle to "explore the items further." Thus, the purpose of the detention appears to have been linked to obtaining Jutte's consent to search his tractor-trailer, even though the inspectors' suspicions about whether the vehicles were stolen could not be confirmed. Under these circumstances, we find no intervening or attenuating circumstances to cleanse the taint of the illegal arrest.

### CONCLUSION

{24} For the foregoing reasons, we determine that the district court erred by denying Jutte's motion to suppress the evidence obtained after he was arrested without probable cause. Therefore, we reverse Jutte's conviction and remand for further proceedings consistent with this opinion.

{25} **IT IS SO ORDERED.**

WECHSLER and ARMIJO, JJ., concur.