2005-NMCA-129

123 P.3d 777

**STATE of New Mexico,
Plaintiff–Appellee,**

v.

**Shawn MONTELEONE, Defendant–
Appellant.**

**Nos. 24,811, 24,795.**

Court of Appeals of New Mexico.

Sept. 15, 2005.

Certiorari Granted, No. 29,478,
Nov. 14, 2005.

Patricia A. Madrid, Attorney General, Santa Fe, NM, Elizabeth Blaisdell, Assistant Attorney General, Albuquerque, NM, for Appellee.

John Bigelow, Chief Public Defender, Cynthia S. Sully, Assistant Appellate Defender, Santa Fe, NM, for Appellant.

## OPINION

VIGIL, Judge.

{1} Defendant consented to a search of his apartment by armed police officers after they entered his apartment without a search warrant in the early morning hours while he was sleeping. During their search, the police discovered evidence of a methamphetamine lab. We hold that there was insufficient attenuation between the officers' illegal entry into Defendant's apartment and his consent. As a result, Defendant's consent was the fruit of a poisonous tree, and the evidence the police discovered during the ensuing search should have been suppressed. We therefore reverse the district court's denial of Defendant's motion to suppress and remand.

## BACKGROUND

{2} In April 2002, Defendant rented two rooms of a house owned by Husband and Wife (Landlords), consisting of a living area and a partially divided kitchen-type area for $300 per month and one-third of the utilities. There were two doors to Defendant's apartment, a door inside Landlords' house which opened into Defendant's living area, and a door in Defendant's kitchen area which opened outside. Defendant was able to lock the door inside Landlords' house from his side, but it was not locked the morning of the search. Defendant used Landlords' refrigerator in their kitchen and a bathroom in their part of the house because he had no refrigerator of his own and no bathroom in his apartment. Landlords in turn did their laundry in Defendant's kitchen area where they kept their washer and dryer and Husband stored some of his tools in the apartment. While Landlords could do laundry or get

tools when Defendant was not home, they rarely did so and they always knocked before entering when he was home. Landlords did not permit anyone else to enter Defendant's rooms because it was his private living area with his personal belongings, and they did not believe they had authority to do so.

{3} Officer Gonterman of the Albuquerque Police Department received information that there was a possible methamphetamine lab operated by a "Shawn" or someone using the name "Popcorn" at the address where Landlords' house was located. On December 29, 2002, at approximately 6:00 or 7:00 a.m., she went to Landlords' house, accompanied by Officer White, and knocked on the door and window, awakening Landlords and their overnight guest. Officers Gonterman and White told Landlords that they had information that there was a methamphetamine lab in their house, and asked if Landlords had any information or knowledge of a lab and whether they could come into the house. Husband allowed the officers to enter, and subsequently granted the officers permission to search the house.

{4} The evidence conflicts about what knowledge the officers had about Defendant living in the house, and when they obtained that knowledge. Wife testified that when Husband answered the door and the officers asked for permission to search the house, she heard Husband tell the officers that somebody else's apartment was in the house. Wife said the officers then asked if "he" was home, and Husband answered they did not know. Husband testified that while the officers were searching the house, he was sitting in the living room, as instructed, when the male officer asked: "What's in there?" Husband testified he told the officer that the area of the house that the officer was asking about was rented. Husband said this was the first time he said anything about renting any part of the house, and he did not know if this conversation was before or after the door to Defendant's apartment was opened. Husband said his memory was vague about some details because, "[i]t was early in the morning and [he] had just woken up. It was kind of crazy." On the other hand, Officer White testified he never had any conversa-

tion with Landlords regarding anyone else living in the house, and that he and Officer Gonterman were both surprised when Defendant was discovered in the home. Officer Gonterman testified that before Defendant's room was discovered, she asked Wife if she knew who Shawn or Popcorn was, and Wife answered they had rented a part of their house to her husband's friend, Shawn, and that he lived in the back of the house.

{5} The officers gathered Husband, Wife, their children, and their guest in one room and began their search. In this process they were separated, with Officer White in one part of the house, and Officer Gonterman in another. Officer White testified he opened a door which turned out to be a closet. He then opened another door further down the hallway identical to the first and observed a male and female sleeping on a couch. He called to Officer Gonterman and they then entered the room. As they entered the room, Officer Gonterman noticed that there was "a rifle leaning against the corner by a dresser." Because the officers could not tell whether the couple on the couch was armed, they announced, "Albuquerque Police Department. Show us your hands." Defendant complied. Officer White was certain he did not draw his weapon upon entering Defendant's room. However, Officer Gonterman was not certain whether her handgun was drawn when she entered Defendant's room. Her habit would be to draw her weapon and keep it in a "low-riding" position pointed to the ground until Defendant showed her his hands as instructed, then replace it in the holster. She said she was certain that neither officer had his or her gun drawn when Defendant was asked for permission to search.

{6} Officer Gonterman testified that after she and Officer White entered the room, announced, "Albuquerque Police Department" and ordered Defendant to "[s]how us your hands[,]" that the officers "told [Defendant] why [they] were there, that [they] suspected there was a meth lab in [Defendant's apartment] somewhere and asked ... if [they] could search [Defendant's] room[.] [Defendant] said, 'Go ahead and look. I'm sleeping. Do whatever you want.' Some-thing to that effect." Officer White said that after he and Officer Gonterman entered the room and announced themselves as Albuquerque Police Officers, Defendant was told that the officers "had reason to believe that there's a meth lab at the house. [Defendant] kind of leaned up while [the officers] were talking with him. He advised [the officers], '[s]earch what you want. I'm going back to sleep.' And he laid [sic] back down." Gonterman stayed with Defendant and his girlfriend who remained on the couch while Officer White looked around the room. The subsequent search of Defendant's rooms uncovered drug paraphernalia, muriatic acid, tubing glassware, and other materials consistent with manufacturing methamphetamine.

{7} Defendant moved to suppress all evidence seized as a result of the officers' entry into his apartment. The district court denied the motion to suppress. Defendant then pled guilty to trafficking methamphetamine by manufacturing and to a separate charge of possession of methamphetamine, reserving his right to appeal the denial of his motion to suppress. We reverse.

## STANDARD OF REVIEW

{8} The determination of whether a search is constitutionally reasonable involves mixed questions of law and fact. *State v. Flores*, 1996–NMCA–059, ¶ 6, 122 N.M. 84, 920 P.2d 1038. Therefore, when we review a district court's ruling on a motion to suppress, we defer to the district court's findings of fact to the extent that they are supported by substantial evidence. *State v. Rector*, 2005–NMCA–014, ¶ 4, 136 N.M. 788, 105 P.3d 341; *State v. Pierce*, 2003–NMCA–117, ¶ 8, 134 N.M. 388, 77 P.3d 292. We then review whether the district court correctly applied the law to the facts de novo. *Rector*, 2005–NMCA–014, ¶ 4, 136 N.M. 788, 105 P.3d 341.

## DISCUSSION

{9} The United States Constitution and the New Mexico Constitution both prohibit unreasonable searches and seizures. U.S. Const. amend. IV; N.M. Const. art. II, § 10. "A search is an intrusion on a person's reasonable expectation of privacy." *State v. Cleave*, 2001–NMSC–031, ¶ 11, 131 N.M. 82, 33 P.3d 633 (internal quotation

marks and citations omitted); *accord Maryland v. Macon*, 472 U.S. 463, 469, 105 S.Ct. 2778, 86 L.Ed.2d 370 (1985). Among the areas afforded the greatest protection by these constitutional provisions is a person's home. *See State v. Wagoner*, 1998–NMCA–124, ¶ 10, 126 N.M. 9, 966 P.2d 176 (noting that the " 'physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed' " (quoting *United States v. United States Dist. Ct.*, 407 U.S. 297, 313, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972))). Therefore, a warrantless search of a home is "presumptively unreasonable, subject only to a few specific, narrowly defined exceptions." *State v. Ryon*, 2005–NMSC–005, ¶ 23, 137 N.M. 174, 108 P.3d 1032.

{10} The district court made a finding that "Officer White inadvertently entered the rented portion of the home and was surprised to find two individuals there." Nevertheless, by inadvertently entering Defendant's apartment without a warrant, Officer White intruded upon Defendant's reasonable expectation of privacy. *See McDonald v. United States*, 335 U.S. 451, 453–54, 69 S.Ct. 191, 93 L.Ed. 153 (1948) (holding police violated the Fourth Amendment in searching the room defendant rented in a residence without a search warrant); *People v. Ponto*, 103 A.D.2d 573, 480 N.Y.S.2d 921, 924 (N.Y.App.Div.1984) (holding defendant had a reasonable expectation of privacy in room he rented inside home); *State v. Fitzgerald*, 19 Or.App. 860, 530 P.2d 553, 555 (1974) (same). *See also State v. Attaway*, 117 N.M. 141, 148, 870 P.2d 103, 110 (1994) (noting that, as a general matter, the " 'Fourth Amendment is violated by an unannounced police intrusion into a private home' " (quoting *Ker v. California*, 374 U.S. 23, 47, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963) (Brennan, J., concurring in part and dissenting in part))), *modified on other grounds by State v. Lopez*, 2005–NMSC–018, 138 N.M. 9, 116 P.3d 80. Therefore, absent an exception to the warrant requirement, the officers' entry into Defendant's apartment was a violation of his constitutional rights under both the United States and New Mexico Constitutions. *State v. Diaz*, 1996–NMCA–104, ¶ 8, 122 N.M. 384, 925 P.2d 4 (holding that "[a] search and seizure conducted without a warrant is un-

reasonable unless it is shown to fall within one of the exceptions to the warrant requirement"); *accord Minnesota v. Dickerson*, 508 U.S. 366, 372, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993). We also note that "[t]he state has a heavy burden when it seeks to justify warrantless arrests and searches." *State v. Wright*, 119 N.M. 559, 562, 893 P.2d 455, 458 (Ct.App.1995).

{11} The State argues that a warrant was not required because Landlords consented to a search of the house, which properly included Defendant's apartment. We disagree.

{12} "A search based upon a valid consent is an exception to the requirement for obtaining a search warrant." *State v. Mann*, 103 N.M. 660, 664, 712 P.2d 6, 10 (Ct.App.1985). However, "mere status as the owner cannot resolve the question of the validity of the consent." *Diaz*, 1996–NMCA–104, ¶ 12, 122 N.M. 384, 925 P.2d 4. Instead, the validity of consent to search Defendant's rooms turns on whether Landlords had common authority over Defendant's apartment. *Id.* ¶ 9; *accord United States v. Matlock*, 415 U.S. 164, 171, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974) (noting that a warrant is not required where "permission to search was obtained from a third party who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected"). The evidence fails to meet this standard.

{13} In *Diaz*, we held that a father could not validly consent to a search of his adult son's bedroom inside the father's home. Although the father testified that he could enter his son's room without permission, we held that the district court had properly concluded that the father did not have common authority over the room. *Id.* ¶ 15. We based our conclusion on the fact that the father was not a co-occupant of the room and that his son "had far greater access and control" over the room. *Id.* ¶ 16. Moreover, his son had "a superior privacy interest" in the room. *Id.* The same is true here. Landlords' testimony demonstrates that they did not have common authority over Defendant's apartment. Although they occasionally en-

tered the apartment to do laundry or to access Husband's stored tools, they treated Defendant's apartment as his private residence. Therefore, we hold that the State failed to show that Landlords had common authority over Defendant's apartment. As a result, Landlords could not validly consent to a search of the apartment. *See id.* ¶ 9; *Matlock*, 415 U.S. at 171, 94 S.Ct. 988.

{14} Finally, the State cannot rely upon any claimed apparent authority of Landlords to consent to a search of Defendant's apartment. Under the New Mexico Constitution, the State was required to show that Landlords had "actual, not apparent, authority to grant that consent." *Diaz*, 1996–NMCA–104, ¶ 17, 122 N.M. 384, 925 P.2d 4. *See Wright*, 119 N.M. at 563–64, 893 P.2d at 459–60 (holding that the defendant had a reasonable expectation of privacy in a back bedroom she shared with a companion, where the door to the bedroom was closed and the homeowner gave the defendant and her companion consent to occupy the room, and that the New Mexico Constitution does not allow police to rely on the consent of an individual with apparent authority to justify the warrantless search of a home).

{15} The State also argues that Defendant validly consented to a search of his apartment. We also disagree with this contention.

{16} Officers White and Gonterman violated Defendant's constitutional right to privacy when they entered his apartment without a warrant. Upon entering the apartment, they obtained Defendant's consent to the search that uncovered the physical evidence he now seeks to suppress. The "fruit of the poisonous tree" doctrine "bar[s] the admission of legally obtained evidence derived from past police illegalities." *State v. Bedolla*, 111 N.M. 448, 454, 806 P.2d 588, 594 (Ct.App.1991); *see* 4 Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 8.2(d), at 77 (4th ed.2004) (noting that "the fruit of the poisonous tree doctrine also extends to invalidate consents which *are* voluntary"). Therefore, "the evidence obtained by the purported consent should be held admissible only if it is determined that the consent was *both* volun-

tary and not an exploitation of the prior illegality." 4 LaFave, *supra*, § 8.2(d), at 76; *accord State v. Prince*, 2004–NMCA–127, ¶ 20, 136 N.M. 521, 101 P.3d 332 (holding that "[f]or evidence to be admissible, consent must be both voluntary and purged of all taint from a prior illegality"), *cert. granted*, 2004–NMCERT–011, 136 N.M. 656, 103 P.3d 580. This is because two separate inquiries are involved: first, whether the consent itself is voluntary under the Fifth amendment; and second, whether the consent is the fruit of the poisonous tree under the Fourth Amendment. *See State v. Jutte*, 1998–NMCA–150, ¶ 21, 126 N.M. 244, 968 P.2d 334 (noting that we observed in *Bedolla*, 111 N.M. at 455, 806 P.2d at 595, that under *Brown v. Illinois*, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975), the Fifth Amendment voluntariness test is separate from the Fourth Amendment fruit of the poisonous tree analysis). The district court made a finding that Defendant's consent was "voluntary and unequivocal." This finding is supported by the evidence. We therefore turn to the second inquiry.

{17} To determine whether the evidence discovered by the officers' search should have been suppressed under the "fruit of the poisonous tree" doctrine, we determine whether the officers obtained Defendant's consent "by means sufficiently distinguishable to be purged of the primary taint." *Wong Sun v. United States*, 371 U.S. 471, 488, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963) (internal quotation marks and citation omitted). That is, there must be a break in the causal chain between the illegality and the consent. *See Jutte*, 1998–NMCA–150, ¶ 22, 126 N.M. 244, 968 P.2d 334 ("If there is a break in the causal chain from the unlawful arrest to the search, then the evidence may be admitted."). If there is sufficient attenuation between the illegality and the consent to search, the evidence is admissible. "To determine whether there was 'sufficient attenuation,' we consider the temporal proximity of the arrest and the consent, the presence of intervening circumstances, and the flagrancy of the official misconduct." *Id.; see Brown*, 422 U.S. at 603–04, 95 S.Ct. 2254. The district court concluded, without analyzing these factors, that

"[e]ven if the initial entry into [D]efendant's room was not lawful, the subsequent consent by [D]efendant was still valid as the entry did not taint the subsequent consent." We review this conclusion de novo. *Rector,* 2005–NMCA–014, ¶ 4, 136 N.M. 788, 105 P.3d 341.

{18} First, the temporal proximity of the officers' illegal entry into Defendant's apartment and his consent weighs against a finding that the taint of the illegality was purged. Officers White and Gonterman sought Defendant's consent almost immediately after illegally entering his apartment. *See United States v. Robeles–Ortega,* 348 F.3d 679, 683 (7th Cir.2003) (holding that temporal proximity of the consent to the illegal entry weighed against a finding that the taint had been purged "because a consent obtained immediately after an illegal entry is less likely to be unconnected to that entry"). Second, there were no intervening circumstances between the officers' illegal conduct and Defendant's consent. *Cf. United States v. Oguns,* 921 F.2d 442, 447–48 (2d Cir.1990) (holding that "intervening circumstances" diminished the taint of the federal agents' unlawful entry because "the agents read to [the defendant] a consent to search form, indicating [his] right to refuse to consent to a search[,]" and the defendant read the form himself and signed it); *State v. Phillips,* 218 Wis.2d 180, 577 N.W.2d 794, 807 (1998) (holding that "intervening circumstances" attenuated the taint of the law enforcement officers' illegal entry into the defendant's home because the officers explained to the defendant that (1) they were investigating a crime; (2) they did not have a warrant; and (3) they could not search without his permission).

{19} Third and finally, we consider the nature of the officers' misconduct. The district court found that Officer White's initial entry into Defendant's apartment was "inadvertent." The evidence conflicts about whether either officer was told that Defendant was renting rooms in the house and whether it was before or after they entered his room. We understand the district court's finding of inadvertence to mean that the officers did not know that they would find Defendant when they opened what appeared

to be another closet door; as we understand the finding, it is supported by the evidence. However, Defendant was in a very vulnerable position when he consented to the search. Two armed police officers entered his apartment in the early morning hours and awakened him, demanding that he show them his hands. They then immediately told Defendant they suspected the presence of a methamphetamine lab and asked if they could search. Under the circumstances, the "request" to search could have very easily been construed as a "demand" to search. To this extent, at least, the officers "exploited" their illegal entry into Defendant's apartment. Therefore, despite the inadvertence of the intrusion, we conclude, based on the weight of the applicable factors of our analysis, that Defendant's consent "was not obtained by means sufficiently distinguishable as to be purged of the primary taint." *Robeles–Ortega,* 348 F.3d at 684 (internal quotation marks omitted). We are particularly concerned with the officers' use of tactics that appear designed to "cause surprise, fright, and confusion," *see id.* (internal quotation marks and citation omitted), such as knocking on windows and doors in the darkness of a December morning and announcing to the sleeping Defendant "Police.... Show us your hands."

{20} Policy also drives our conclusion in this case. The objective of the exclusionary rule in New Mexico is not to deter police misconduct but "to effectuate in the pending case the constitutional right of the accused to be free from unreasonable search and seizure." *State v. Gutierrez,* 116 N.M. 431, 446, 863 P.2d 1052, 1067 (1993). This is why the good-faith exception to the federal exclusionary rule is deemed to be incompatible with the constitutional protections found under Article II, Section 10 of the New Mexico Constitution. *Id.* at 446–47, 863 P.2d at 1067–68. Moreover, "[t]here is established New Mexico law interpreting Article II, Section 10 [of the New Mexico Constitution] more expansively than the Fourth Amendment." *State v. Gomez,* 1997–NMSC–006, ¶ 24, 122 N.M. 777, 932 P.2d 1. In this case, suppressing the evidence illegally obtained by Officers White and Gonterman "best effectuates the constitutional proscription of unreasonable searches and seizures by pre-

serving the rights of the accused to the same extent as if the government's officers had stayed within the law." *Gutierrez,* 116 at 446, 863 P.2d at 1067.

{21} The State failed to establish that Defendant's consent to search his apartment was purged of the taint of the officers' illegal entry. The evidence discovered by Officers White and Gonterman during their search of Defendant's apartment should have been suppressed.

## CONCLUSION

{22} We hold that Officers Gonterman and White acquired the methamphetamine lab evidence that Defendant seeks to suppress by violating his rights under the Fourth Amendment and Article II, Section 10 of the New Mexico Constitution. We therefore reverse the district court's denial of Defendant's motion to suppress and remand.

{23} **IT IS SO ORDERED.**

WE CONCUR: LYNN PICKARD and CELIA FOY CASTILLO, Judges.