**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

**Opinion Number: 2014-NMCA-117**

**Filing Date: September 16, 2014**

**Docket No. 32,990**

**STATE OF NEW MEXICO,**

      **Plaintiff-Appellee,**

**v.**

**CLINTON SKIPPINGS,**

      **Defendant-Appellant.**

**APPEAL FROM THE DISTRICT COURT OF LEA COUNTY**
**Gary L. Clingman, District Judge**

Gary K. King, Attorney General
Santa Fe, NM
Jacqueline R. Medina, Assistant Attorney General
Albuquerque, NM

for Appellee

The Law Offices of the Public Defender
Jorge A. Alvarado, Chief Public Defender
Karl Erich Martell, Assistant Appellate Defender
Santa Fe, NM

for Appellant

**OPINION**

**WECHSLER, Judge.**

**{1}**    Defendant Clinton Skippings appeals the district court's denial of his motions to suppress evidence, having reserved the issue of whether his motions were properly denied in his conditional plea agreement. Defendant argues that police officers lacked reasonable suspicion to stop him based on a confidential informant's tip and also asserts that he was subject to a de facto arrest without probable cause, tainting Defendant's consent and making

1

the evidence discovered fruit of an illegal search. Accordingly, Defendant asks this Court to reverse the district court's denial of his motions to suppress. We conclude that Defendant's motions were properly denied and therefore affirm the district court.

**BACKGROUND**

**{2}**     The factual context in this case is central to the resolution of this appeal and is established by the testimony of Defendant and Lea County Drug Task Force (Task Force) Agents Byron Wester and Keith Clayton at the hearings on Defendant's motions to suppress evidence. On August 29, 2012, Agents Wester and Clayton were working with a confidential informant in Hobbs, New Mexico. With the officers present, the informant set up a purchase of crack cocaine with Defendant in a cell phone conversation. The informant provided the following details regarding the deal: (1) Defendant immediately would be in the parking lot of Big Lots with the crack cocaine; and (2) Defendant would be in one of two vehicles that he was known to drive (either a white passenger car or a gold-colored pickup). The Drug Task Force had used this confidential informant on numerous past occasions, and the confidential informant had provided reliable information that led to multiple arrests and convictions.

**{3}**     Upon receiving the informant's tip, Agent Wester proceeded to the Big Lots parking lot, where he observed Defendant and a female passenger in a white vehicle, as described by the informant. Agent Wester watched Defendant drive across the street to an apartment complex, at which time he briefly lost sight of the vehicle; Defendant returned shortly thereafter in the same vehicle but without the female passenger. Defendant then exited the parking lot and drove south on Dal Paso Street. At that time, Agent Wester requested that the Hobbs Police Department stop Defendant. The parties stipulated below that the sole purpose of the stop was to further the agents' investigation of Defendant based on the informant's information.

**{4}**     Hobbs police officers stopped Defendant at approximately 7:25 p.m., when there was still daylight. Agent Wester arrived at the scene within a few minutes, at which time he observed Defendant standing outside his vehicle with a police officer. Agent Wester approached Defendant, explained who he was, and told Defendant that he was not under arrest but being detained for investigative purposes. Agent Wester patted down Defendant for weapons. Defendant was then handcuffed and read his *Miranda* rights. Defendant indicated his willingness to talk with the agent, he and Agent Wester sat down on a curb, and Agent Wester engaged Defendant in a conversation. Agent Wester testified that Defendant was handcuffed for safety purposes because Defendant had a history of violence. Several other officers were present, but they did not engage in conversation with Defendant. Agent Wester told Defendant about the investigation into his alleged trafficking of crack cocaine.

**{5}**     Within ten minutes of the initial stop, while speaking to Agent Wester, Defendant told Agent Wester that he was willing to consent to a search of his vehicle. At that time, Defendant's handcuffs were removed so that he could sign a consent form. Agent Clayton

2

read the consent form to Defendant and gave it to Defendant to sign. The handcuffs were not placed back on Defendant; Defendant was in handcuffs no more than ten minutes. After signing the consent form, Defendant and Agent Wester resumed sitting on the curb and conversing, while other agents performed the search of Defendant's vehicle. As soon as the agents opened the door of Defendant's vehicle, the agents discovered marijuana.

{6}     During the search, Agent Wester and Defendant continued to sit on the curb and talk about Defendant's alleged involvement in narcotics activity in the area. Agent Wester also talked to Defendant about whether he would be willing to do some work for the Task Force and various other topics, including Defendant's addiction to narcotics. Agent Wester maintained a professional and non-threatening tone of voice throughout his conversation with Defendant. After the search of the vehicle was complete, Agent Wester asked Defendant "if he had anything on him" and asked for consent to search his person, which Defendant gave. Agent Wester found approximately $1200 and a plastic bag of crack cocaine on Defendant. By that time, approximately forty-five minutes had passed since the stop. Defendant was then arrested for trafficking a controlled substance contrary to NMSA 1978, Section 30-31-20 (2006).

{7}     Defendant moved to suppress all contraband found and seized by the Task Force, asserting that (1) the agents lacked reasonable suspicion to initiate an investigatory detention based on a confidential informant's tip, and (2) Defendant was subjected to a de facto arrest requiring probable cause and tainting his consent to search his vehicle and his person. The district court denied his motions, and Defendant entered a conditional plea in which he reserved the right to appeal the denials of the motions. Defendant renews both arguments on appeal.

**STANDARD OF REVIEW**

{8}     "[R]eview of a district court's ruling on a motion to suppress involves a mixed question of fact and law." *State v. Rowell*, 2008-NMSC-041, ¶ 8, 144 N.M. 371, 188 P.3d 95 (internal quotation marks and citation omitted). We review factual questions under a substantial evidence standard and the application of law to facts de novo. *State v. Pacheco*, 2008-NMCA-131, ¶ 3, 145 N.M. 40, 193 P.3d 587. We recognize that "the district court has the best vantage from which to resolve questions of fact and to evaluate witness credibility. Accordingly, we review the facts in the light most favorable to the prevailing party" provided that substantial evidence exists to support the factual findings. *State v. Sewell*, 2009-NMSC-033, ¶ 12, 146 N.M. 428, 211 P.3d 885 (internal quotation marks and citation omitted). Finally, we "review the application of the law to those facts, making a de novo determination of the constitutional reasonableness of a search or seizure." *Id.*

**LEGALITY OF THE INITIAL STOP**

{9}     It is well established that "stopping an automobile and detaining its occupants constitute a seizure under the Fourth and Fourteenth Amendments." *State v. Werner*, 1994-

3

NMSC-025, ¶ 11, 117 N.M. 315, 871 P.2d 971 (alteration, internal quotation marks, and citation omitted); *State v. Funderburg*, 2008-NMSC-026, ¶ 13, 144 N.M. 37, 183 P.3d 922. However, only unreasonable searches and seizures are proscribed. *Werner*, 1994-NMSC-025, ¶ 11. Under New Mexico and federal case law, "[p]olice may make an investigatory stop in circumstances that do not rise to the level of probable cause for an arrest if the officers have a reasonable suspicion that the law has been or is being violated." *State v. Alderete*, 2011-NMCA-055, ¶ 15, 149 N.M. 799, 255 P.3d 377 (internal quotation marks and citation omitted); *see Werner*, 1994-NMSC-025, ¶ 11 ("Under *Terry v. Ohio*, 392 U.S. 1 . . . (1968), and its progeny, police officers may stop a person for investigative purposes where, considering the totality of the circumstances, the officers have a reasonable and objective basis for suspecting that particular person is engaged in criminal activity." (internal quotation marks and citation omitted)). "A valid investigatory stop allows an officer to detain suspects briefly to verify or quell that suspicion." *Sewell*, 2009-NMSC-033, ¶ 13.

**{10}** To justify a stop based on reasonable suspicion, there must be "specific and articulable facts that, together with the rational inferences from those facts, reasonably warrant the intrusion." *Alderete*, 2011-NMCA-055, ¶ 15 (internal quotation marks and citation omitted). This Court's case law establishes that information supplied by a confidential informant may support a reasonable suspicion, thereby justifying an investigatory detention. *See, e.g.*, *id.* ¶¶ 2, 18-20 (upholding a traffic stop based in part on information from a confidential informant that the house from which the vehicle had departed was being used as a stash house for large quantities of marijuana); *State v. Robbs*, 2006-NMCA-061, ¶¶ 2-4, 12-19, 139 N.M. 569, 136 P.3d 570 (holding that a tip received from a confidential informant that accurately described the vehicle, route, and time of movement, supplied reasonable suspicion justifying a traffic stop); *State v. De Jesus-Santibanez*, 1995-NMCA-017, ¶¶ 11-13, 119 N.M. 578, 893 P.2d 474 (upholding a traffic stop based on a "Be-On-the-Lookout" alert premised on information supplied by a confidential informant, who had supplied a description of the vehicle, time and direction of travel, route, and the origin of the vehicle's license plate).

**{11}** Because "[r]easonable suspicion depends on the reliability and content of the information possessed by the officers[,]" *Robbs*, 2006-NMCA-061, ¶ 13, we look to the information processed by the agents in this case. The agents were working with an informant that the Task Force had used on numerous occasions and who had proven to be a reliable source of information. The agents were present when the informant telephonically arranged the drug deal with Defendant. The informant supplied the agents with specific information, including a description of the vehicle that Defendant would be in, the type of drug Defendant would be selling, and the time and location of the drug deal. The informant was able to predict Defendant's future behavior, indicating that the informant had access to reliable information about the person's illegal activities. *See id.* ¶ 14.

**{12}** This case is similar to *Robbs*, in which the informant (1) told detectives that the defendant would be delivering methamphetamine to an address in a city in New Mexico, and (2) described the defendant's vehicle with a personalized license plate. *Id.* ¶ 2. In that case,

4

we concluded that the tip was enough to support reasonable suspicion necessary for the investigatory stop of the defendant's vehicle. *Id.* ¶ 19. The informant in this case provided a similar level of detail, and the agents verified the information when the movements of Defendant accorded with the informant's tip. Under the totality of the circumstances, specific and articulable facts supported the agents' suspicion that Defendant was engaged in drug trafficking.

**{13}** To the extent that Defendant argues the stop was "pretextual" under *State v. Ochoa*, we do not agree; the issue in this case is one of reasonable suspicion, not whether officers engaged in an unreasonable, pretextual stop. 2009-NMCA-002, ¶¶ 39-42, 146 N.M. 32, 206 P.3d 143; *see id.* ¶ 25 ("A pretextual traffic stop is a detention supportable by reasonable suspicion or probable cause to believe that a traffic offense has occurred, but is executed as a pretense to pursue a 'hunch,' a different more serious investigative agenda for which there is no reasonable suspicion or probable cause."). Having determined that reasonable suspicion supported the agents' decision to have Defendant stopped, we turn to the second issue: whether the lawful investigatory detention became a de facto arrest requiring probable cause.

## INVESTIGATORY DETENTION AS A DE FACTO ARREST

**{14}** While an investigatory detention supported by reasonable suspicion is permitted, an arrest requires probable cause. *State v. Wilson*, 2007-NMCA-111, ¶ 18, 142 N.M. 737, 169 P.3d 1184. "When an officer with reasonable suspicion but without probable cause detains an individual in an unreasonable manner, the detention may amount to a de facto arrest, rather than an investigatory detention." *Id.* There is no bright-line test for evaluating when an investigatory detention becomes invasive enough to become a de facto arrest. *Werner*, 1994-NMSC-025, ¶ 13. However, there are several factors that we consider, including (1) "the government's justification for the detention," (2) "the character of the intrusion on the individual," (3) "the diligence of the police in conducting the investigation," and (4) "the length of the detention." *Robbs*, 2006-NMCA-061, ¶ 21. We are also guided by the circumstances in other cases in which investigative detentions have been held to be de facto arrests or impermissibly invasive. *Pacheco*, 2008-NMCA-131, ¶ 22.

**{15}** The State points out, and the facts when viewed in the light most favorable to the prevailing party indicate, that contraband was discovered within ten minutes from the time the agents made contact with Defendant, but did not then result in an arrest. If the ten minute detention of Defendant was impermissibly invasive, Defendant's consent to search his vehicle and his person would be tainted, and the evidence should have been suppressed. *See State v. Jutte*, 1998-NMCA-150, ¶ 14, 126 N.M. 244, 968 P.2d 334 ("[I]f [the defendant's] detention constituted a de facto arrest prior to the search, then that arrest was unlawful and it may have tainted his consent to the search."). If, however, the ten minute detention was a valid investigatory detention, at the point that the agents found contraband, they had probable cause to arrest Defendant for possession of a controlled substance contrary to NMSA 1978, Section 30-31-23 (2011) and to search his person. *See State v. Weidner*, 2007-

5

NMCA-063, ¶¶ 18-20, 141 N.M. 582, 158 P.3d 1025 (explaining the "search incident to arrest" exception to the warrant requirement and concluding that even if a search occurs before formal arrest, it is lawful if the evidence discovered was not necessary to justify the arrest). Thus, we focus our inquiry on the time between Defendant's stop and the discovery of the marijuana.

**{16}**     In support of his argument that he was subject to a de facto arrest, Defendant states that "officers swarmed the scene and demanded his identity" and that he was removed from his car, handcuffed, patted down, seated on the ground, and read his *Miranda* rights. Defendant asserts that, based on the duration and circumstances of his detention, his consent was invalid and the contraband discovered should have been suppressed. For the following reasons, we do not agree.

**{17}**     With regard to the first factor—the government's justification for intrusion— we have explained that "[i]f the nature and extent of the detention minimally intrude on an individual's Fourth Amendment interests, opposing law enforcement interests can support a seizure based on less than probable cause." *Robbs*, 2006-NMCA-061, ¶ 20 (internal quotation marks and citation omitted). The government has a significant interest in preventing the use and distribution of drugs like cocaine. *See Pacheco*, 2008-NMCA-131, ¶ 20 (explaining that prevention of use and distribution of methamphetamine was a significant governmental interest); *Robbs*, 2006-NMCA-061, ¶ 22 (same). Therefore, "[i]nsofar as [the agents] had a reasonable, articulable suspicion that drug-related criminality was afoot, the justification for the intrusion was substantial." *Pacheco*, 2008-NMCA-131, ¶ 20.

**{18}**     The second factor—the character of the intrusion—requires careful parsing in this case. While Defendant was only detained for ten minutes and told he was not under arrest, he was handcuffed and given his *Miranda* rights. There exists no New Mexico case addressing this unique set of circumstances; accordingly, we examine, in light of the authority that we do have, where on the continuum this case falls. Those cases that conclude that an initially lawful investigatory detention became a de facto arrest all present circumstances in which the defendant was detained for at least one hour. *See, e.g.*, *Werner*, 1994-NMSC-025, ¶¶ 11-20 (holding that when the defendant was told that he was not free to leave and detained for one hour, including forty-five minutes in the back of a patrol car while awaiting identification, it was a de facto arrest); *see also Jutte*, 1998-NMCA-150, ¶¶ 14-20 (holding that one-hour detention at an inspection checkpoint ripened into an improper de facto arrest when the officers had exhausted the means of investigation by which they could confirm or dispel their suspicions quickly); *State v. Hernandez*, 1997-NMCA-006, ¶ 22, 122 N.M. 809, 932 P.2d 499 (concluding that a nearly two-hour detention in a trailer at a checkpoint while waiting for a female agent who had to be summoned from another location to search the female defendant after search of vehicle turned up no contraband, constituted a de facto arrest); *State v. Flores*, 1996-NMCA-059, ¶¶ 4, 15, 122 N.M. 84, 920 P.2d 1038 (holding that a two- to three-hour detention in handcuffs at a police warehouse after a one-hour roadside detention constituted a de facto arrest). Although the duration of

detention is not dispositive, as we note below, it is an important consideration as evidenced by our case law.

**{19}** Perhaps even more helpful to our analysis are those cases in which investigative detentions were held not to have become de facto arrests. *See, e.g.*, *Sewell*, 2009-NMSC-033, ¶¶ 15-25 (holding that a ten minute detention during which time officers questioned the defendant outside his vehicle about possible drug trafficking and performed search of his vehicle after obtaining consent was not a de facto arrest); *see also Pacheco*, 2008-NMCA-131, ¶¶ 19-25 (holding that thirty minute roadside detention was not impermissibly invasive or extended); *Robbs*, 2006-NMCA-061, ¶¶ 29-30 (holding that thirty-five to forty minute detention while awaiting a canine unit to perform a narcotics investigation was reasonable); *State v. Lovato*, 1991-NMCA-083, ¶¶ 23-32, 112 N.M. 517, 817 P.2d 251 (holding that the defendants were not arrested when they were pulled over, ordered to get out of the vehicle at gunpoint, and handcuffed prior to questioning). While at first glance this case appears to be analogous to *Sewell*, when examined more carefully, the circumstances in this case were more invasive. Although Defendant was only detained for ten minutes, he was also patted down for weapons, handcuffed, and read his *Miranda* rights. Nevertheless, even these circumstances do not indicate that Defendant's lawful investigatory detention had become a de facto arrest.

**{20}** The evidence indicates that Defendant was patted down for weapons and handcuffed because of Agent Wester's concern for officer safety because Defendant had a history of violence. The defendant in *Flores*, in which we concluded the defendant was subject to a de facto arrest, was handcuffed; however, he was detained for two to three hours and handcuffed for most of that time. 1996-NMCA-059, ¶ 15. Additionally, he was "faced with heavy weaponry in a hostile environment, while subjected to a second search that differed significantly in scope and location from the first." *Id.* ¶ 26. In *Lovato*, the defendants were handcuffed upon exiting their vehicle, and we concluded that the level of force did not convert the investigatory detention into an arrest. 1991-NMCA-083, ¶¶ 24-27, 32. Therefore, while we consider the fact that Defendant was handcuffed, it is not determinative. *See Wilson*, 2007-NMCA-111, ¶ 19 ("[I]n the context of the Fourth Amendment, without transforming a seizure from an investigatory detention to a de facto arrest, courts have upheld the use of handcuffs . . . and other measures of force." (internal quotation marks and citation omitted)); *see also In re David S.*, 789 A.2d 607, 614 (Md. 2002) ("[A]n investigatory stop is not elevated automatically into an arrest because the officers handcuffed the suspect."). In this case, as in *Lovato* and unlike in *Flores*, Defendant was handcuffed due to his known history of violence and consequent officer safety concerns. Agent Wester testified that upon removing the handcuffs, Defendant remained calm and was no longer a safety concern and was therefore not recuffed. Based on the foregoing and viewing the facts most favorable to the prevailing party, the agents did not act unreasonably in dealing with the risk that they faced and were not unreasonable in patting down and handcuffing Defendant; therefore, the fact that Defendant was handcuffed does not transform the detention into an arrest. *See Lovato*, 1991-NMCA-083, ¶¶ 26-27 (explaining that officers may adopt precautionary measures, including performing a protective frisk and handcuffing,

7

based on reasonable fears).

**{21}** We pause to note that we reach this conclusion with very limited evidence before us. There was little testimony at the suppression hearing regarding Defendant's alleged "history of violence." By comparison, in *Lovato*, 1991-NMCA-083, ¶¶ 24-32, the basis for the use of handcuffs was apparent, and we determined that the use of force was reasonable because the officers stopped a vehicle carrying suspects in a drive-by shooting that had been committed minutes before. This case is not as clear. However, we must view the facts in the light most favorable to the prevailing party (here, the State), and Defendant failed to present any evidence to the contrary or to challenge the reasonableness of the use of handcuffs under these circumstances either below or on appeal. We avoid "unrealistic second-guessing of police officers' decisions in this regard" and do not require that they use the least intrusive means, only reasonable ones. *United States v. Melendez-Garcia*, 28 F.3d 1046, 1052 (10th Cir. 1994) (internal quotation marks and citation omitted). Thus, because there was uncontroverted evidence that Defendant was known to be violent, we cannot conclude that handcuffing Defendant was unreasonable. The evidence presented at the suppression hearing indicates that the agents relied on their knowledge of Defendant's history of violence in determining that he needed to be handcuffed; thus, while the State bears the burden in proving the reasonableness of the detention, we cannot say that the agents' fears were unfounded without evidence to the contrary. It is also significant that Defendant's handcuffs were removed within ten minutes and he was not recuffed, because, according to Agent Wester's testimony, Defendant's calm demeanor during the detention led him to believe that Defendant did not pose a safety threat any longer.

**{22}** We are likewise not convinced that the fact Defendant was given his *Miranda* rights turned the detention into a de facto arrest. *Miranda* warnings are designed to safeguard Fifth Amendment protections. *Cotton v. State*, 872 A.2d 87, 97 (Md. 2005).

> Although the giving of those warnings may be considered along with more relevant factors as part of all that occurred, it should have no special significance in determining whether a temporary detention constitutes an arrest for Fourth Amendment purposes because it may well be required even when there is clearly no arrest.

*Id.*; *see Wilson*, 2007-NMCA-111, ¶ 20 ("[I]f police officers take highly intrusive steps to protect themselves from danger, they must similarly provide protection to their suspects by advising them of their constitutional rights." (internal quotation marks and citation omitted)); *accord United States v. Perdue*, 8 F.3d 1455, 1465 (10th Cir. 1993). In *Wilson*, 2007-NMCA-111, ¶ 21, we rejected the argument that "*Miranda* warnings are never required during an investigatory detention." Relying on federal case law, we explained that "'[i]f a motorist who has been detained pursuant to a traffic stop thereafter is subjected to treatment that renders him 'in custody' for practical purposes, he will be entitled to the full panoply of protections prescribed by [*Miranda*].'" *Id.* ¶ 20 (quoting *Berkemer v. McCarty*, 468 U.S. 420, 421 (1984)). In other words, during an investigatory detention, a defendant may also

be subject to a custodial interrogation, and, if that is the case, *Miranda* warnings need to be given. *Cotton,* 872 A.2d at 97 ("*Miranda* warnings need to be given whenever there is a custodial interrogation, and a custodial interrogation can arise from a pure *Terry* stop that never crosses into an arrest."). As a result, a "cautious or gratuitous recitation of *Miranda* warnings" is not determinative of whether a defendant has been subject to a de facto arrest. *Id.* In *Cotton*, the court explained,

> [I]f the police proceed to interrogate a person seized and temporarily detained pursuant to *Terry* and do not give *Miranda* warnings, any incriminating evidence revealed by that interrogation may, depending on the circumstances, be held inadmissible as the product of a custodial interrogation and thereby doom the validity of an ensuing arrest based on that evidence. The law should encourage police to give those warnings when questioning a suspect, not discourage them by regarding the warnings as converting a good *Terry* stop into a bad arrest.

*Id.*

**{23}** In *Wilson*, we concluded that "in deciding whether a defendant is in *Miranda* custody, the question is not whether he or she is being questioned as a part of an investigatory detention." 2007-NMCA-111, ¶ 20. Whether *Miranda* rights are violated and whether a defendant is subject to an investigatory detention are different inquiries. However, whether a defendant is given *Miranda* rights can and should be considered, along with all the other circumstances in a case, in determining whether a defendant was subject to a de facto arrest. In this case, Defendant was read his *Miranda* rights before Agent Wester began asking him questions about his alleged involvement in trafficking cocaine. The reading of his rights did not convert the investigatory detention into an arrest. *See Perdue*, 8 F.3d at 1463 (concluding that when officers employ force normally associated with an arrest during an investigative detention, *Miranda* warnings are required).

**{24}** Finally, we turn to the duration of the detention and the diligence of the agents' investigation. *See Pacheco*, 2008-NMCA-131, ¶ 19 (addressing duration and diligence prongs together because they "both rest on the same underlying premise, an impermissibly protracted detention"). "A valid investigatory stop allows an officer to detain suspects briefly to verify or quell . . . suspicion." *Sewell*, 2009-NMSC-033, ¶ 13. The evidence in this case, when viewed in the light most favorable to the prevailing party, indicates that, in the first ten minutes of the detention before the discovery of contraband, Defendant was stopped, patted down, given *Miranda* rights, and handcuffed. Agent Wester then talked to Defendant for a short time to investigate his suspicion. At that point, after removing Defendant's handcuffs, explaining the consent form, and allowing Defendant to sign it, the search of Defendant's vehicle began and contraband was discovered almost immediately. The length of the detention (ten minutes) was reasonably limited to the time required to perform all of these activities. There is nothing to indicate that the agents delayed the investigation or were otherwise unreasonable in conducting the investigation. Under these circumstances, the

9

agents were diligent in their investigation and detained Defendant no longer than necessary to verify or quell their suspicion.

**{25}** While "[t]emporal duration is neither the controlling nor the only factor" to consider, our Supreme Court remarked in *Sewell*, "we have found no reported case in which a New Mexico court has ever held that a ten minute detention was impermissibly long in any set of circumstances where there was reasonable suspicion to make a roadside drug stop." 2009-NMSC-033, ¶¶ 17, 18. That statement is still true, and, taking into account duration and all of the other factors, this case does not present circumstances in which a ten minute detention turned into a de facto arrest. Because Defendant was not subject to a de facto arrest, "the ensuing consensual search of the vehicle [and his person] was not tainted." *Pacheco*, 2008-NMCA-131, ¶ 25.

**CONCLUSION**

**{26}** The agents in this case had reasonable suspicion to conduct an investigatory detention, and that detention did not become a de facto arrest prior to the agents' discovery of contraband. Therefore, the district court properly denied Defendant's motions to suppress. We affirm.

**{27}    IT IS SO ORDERED.**

_____
**JAMES J. WECHSLER, Judge**

**WE CONCUR:**

_____
**RODERICK T. KENNEDY, Chief Judge**

_____
**M. MONICA ZAMORA, Judge**

10