2006-NMCA-061

136 P.3d 570

**STATE of New Mexico,
Plaintiff–Appellee,**

v.

**Teresa ROBBS, Defendant–Appellant.**

**No. 25,636.**

Court of Appeals of New Mexico.

March 20, 2006.

Certiorari Denied, No. 29,750,
May 25, 2006.

was sufficiently complete and reliable to provide reasonable suspicion for an investigatory stop regarding drugs. We also examine the scope of the resulting detention of the vehicle for thirty-five to forty minutes while officers awaited the arrival of a canine unit. We conclude that the tip was sufficiently reliable to provide reasonable suspicion because the informant was identified, the tip predicted the future movement of Defendant, and other significant facts provided in the tip were corroborated by the officers. We also conclude that detention of the vehicle was reasonable in light of the circumstances. Accordingly, we affirm.

## I. BACKGROUND

{2} Detective Dan Aguilar of the Clovis Police Department received a tip from an individual who provided identification but requested that the identification be kept confidential. This informant told Detective Aguilar that Defendant and her husband would be delivering fourteen grams of methamphetamine to an address on Tom Watson Street in Clovis, New Mexico. The informant described their vehicle as a silver and white pickup with a personalized license plate, "GLR." Detective Aguilar contacted officers in the Region V Drug Task Force to report the details of the tip. He identified the informant and notified the officers of the informant's request that his identity remain confidential. Detective Aguilar contacted the officers later in the day to report that he had completed a registration check on the vehicle and that it was located in the 1400 block of Pile Street. When the officers first went to Pile Street, the truck was not there. Later, at about 6:45 p.m., Detective Aguilar again called the officers to report that the vehicle was on the 1400 block of Pile Street.

{3} The officers went to Pile Street for the second time, where they saw the pickup with the personalized license plate, as described in the tip. They saw the vehicle's lights come on; it then proceeded south toward the Tom Watson address. The officers followed the vehicle until it was within two or two and a half blocks from the destination described in the tip. They stopped the vehicle as Defendant was about to turn from a four-lane road

Patricia A. Madrid, Attorney General, James W. Grayson, Assistant Attorney General, Santa Fe, NM, for Appellee.

Gary C. Mitchell, P.C., Gary C. Mitchell, Ruidoso, NM, for Appellant.

## OPINION

CASTILLO, Judge.

{1} In this case, we must determine whether a tip provided by a named informant

onto a narrow, poorly lit, two-lane road with no shoulder. The officers testified that for safety and investigative reasons, they did not want Defendant to reach the designated destination.

{4} The officers further testified as follows: They stopped Defendant to investigate whether she was in possession of methamphetamine, as reported in the tip; they did not stop Defendant for a traffic violation. Defendant and another woman were the occupants of the pickup. The officers told Defendant that they had been informed that Defendant was "carrying some dope." After Defendant denied that she was in possession of drugs and denied consent to search, the officers requested the assistance of a drug dog. The canine unit arrived approximately thirty-five to forty minutes later, and the dog alerted to the truck. After the dog alerted, the first search warrant was obtained. Although it is unclear as to when Defendant actually left, she conceded that she was free to leave after the initial questioning and, in fact, did so.

{5} The initial search revealed, in Defendant's purse, a crystal substance that field-tested positive for methamphetamine and, in a briefcase, glass pipes used to consume methamphetamine. Chemicals used to produce methamphetamine were found in the bed of the truck, which was covered by a camper shell. For safety reasons, the officers obtained a second search warrant for the bed of the truck so that any chemicals could be immediately destroyed. Subsequently, Defendant was charged with one count of trafficking by manufacturing of methamphetamine, a second-degree felony, NMSA 1978, § 30-31-20(A)(1) (1990), and one count of possession of a controlled substance, methamphetamine, a fourth-degree felony, NMSA 1978, § 30-31-23(A), (D) (2005).

{6} The district court denied Defendant's motion to suppress. Defendant pled no contest to two counts of possession of a controlled substance with intent to distribute, a third-degree felony, NMSA 1978, § 30-31-22(A)(2)(a) (2005), and one count of possession of a controlled substance, methamphetamine, § 30-31-23(A), (D). The plea was conditional and reserved Defendant's right to appeal the denial of her motion to suppress.

{7} Defendant argues that the evidence from the search should have been suppressed (1) because the tip was neither reliable nor sufficient to create reasonable suspicion for the investigatory stop and (2) because the scope of the investigatory stop was unreasonable and resulted in the improper seizure of Defendant's pickup without probable cause. Agreeing with the State, the district court found the tip to be sufficiently reliable to create reasonable suspicion. As to the scope of the stop, the district court determined that the length of detention was not an impermissible delay because the search was contemporaneous with an arrest. The State does not contend that the search was contemporaneous with an arrest; rather, it asserts that the stop did not exceed the permissible scope of the investigation. *See State v. Rector*, 2005-NMCA-014, ¶ 9, 136 N.M. 788, 105 P.3d 341 (stating that this Court "will affirm the trial court if it is right for any reason" (internal quotation marks and citation omitted)). The relevant facts are undisputed.

## II.  DISCUSSION

### A.  Standard of Review

{8} Reviewing a motion to suppress concerns mixed questions of fact and law. *State v. Urioste*, 2002-NMSC-023, ¶ 6, 132 N.M. 592, 52 P.3d 964. When substantial evidence exists to support the district court's findings of fact, we ask "whether the law was correctly applied to the facts, viewing them in a manner most favorable to the prevailing party." *State v. Werner*, 117 N.M. 315, 317, 871 P.2d 971, 973 (1994) (internal quotation marks and citation omitted); *see Urioste*, 2002-NMSC-023, ¶ 6, 132 N.M. 592, 52 P.3d 964. When we are asked to determine whether there is reasonable suspicion to detain and question an individual about drugs, we look at the evidence "in the light most favorable to the district court ruling." *State v. Van Dang*, 2005-NMSC-033, ¶ 14, 138 N.M. 408, 120 P.3d 830. "[A]ll reasonable inferences in support of the court's decision will be indulged in, and all inferences or evidence to the contrary will be disregarded." *Werner*,

117 N.M. at 317, 871 P.2d at 973 (internal quotation marks and citation omitted).

{9} Questions of reasonable suspicion are reviewed de novo by looking at the totality of the circumstances to determine whether the detention was justified. *Van Dang*, 2005–NMSC–033, ¶ 14, 138 N.M. 408, 120 P.3d 830; *Urioste*, 2002–NMSC–023, ¶ 6, 132 N.M. 592, 52 P.3d 964. "[A] determination of whether the officer ... made an illegal de facto [seizure], or simply conducted a permissible detention," is a question of reasonableness, an issue of law, which "requires the balancing of legitimate law enforcement interests against a defendant's privacy rights, a policy decision which the trial court is in no better position to make than an appellate court." *Werner*, 117 N.M. at 316–17, 871 P.2d at 972–73.

## B. Constitutional Protections

{10} Defendant generally asserts that the investigatory stop was a violation of both the United States Constitution and the New Mexico Constitution. She relies on *Aguilar v. Texas*, 378 U.S. 108, 114, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), *abrogated by Illinois v. Gates*, 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983) (reaffirming "the totality-of-the-circumstances analysis that traditionally has informed probable-cause determinations"), and the two-pronged test for probable cause in her argument that the New Mexico Constitution was violated. *See State v. Cordova*, 109 N.M. 211, 212, 217, 784 P.2d 30, 31, 36 (1989) (holding that the *Aguilar–Spinelli* test is properly used, under Article II, Section 10, of the New Mexico Constitution, to determine whether probable cause exists to obtain a search warrant that is based on affidavits containing hearsay). Defendant also argues that seizure of the truck was unreasonable because no exception to the warrant requirement was applicable. *See State v. Gomez*, 1997–NMSC–006, ¶¶ 1–2, 122 N.M. 777, 932 P.2d 1 (holding that under Article II, Section 10, of the New Mexico Constitution, the State must show reasonable grounds for the belief that exigent circumstances existed to justify a warrantless search of an automobile). Because we decide that the issue presented is one of reasonable suspicion rather than probable cause, we analyze the circumstances here only under the Fourth Amendment of the United States Constitution. Defendant provides no argument that the New Mexico Constitution provides greater protections for issues involving reasonable suspicion.

{11} By prohibiting unreasonable searches and seizures, the Fourth Amendment protects "[t]he right of the people to be secure in their persons ... and effects." U.S. Const. amend. IV; *State v. Morales*, 2005–NMCA–027, ¶ 9, 137 N.M. 73, 107 P.3d 513. The central inquiry is reasonableness. *Terry v. Ohio*, 392 U.S. 1, 19–20, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *State v. Attaway*, 117 N.M. 141, 149, 870 P.2d 103, 111 (1994) (stating that the "ultimate question in all cases ... is whether the search and seizure was reasonable"). Determining whether a seizure or search is reasonable involves two questions: "whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place." *Terry*, 392 U.S. at 19–20, 88 S.Ct. 1868.

## C. Investigatory Stop

{12} A police officer may make an investigatory stop if, under the totality of the circumstances, he has a reasonable and objective basis for suspecting a particular person has committed or is committing a crime. *Werner*, 117 N.M. at 317, 871 P.2d at 973; *see also Urioste*, 2002–NMSC–023, ¶ 10, 132 N.M. 592, 52 P.3d 964 ("[T]he officer must look at ... the whole picture." (internal quotation marks and citation omitted)). The officer's suspicion must rest on specific, articulable facts, "which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry*, 392 U.S. at 21, 88 S.Ct. 1868 (footnote omitted). "The level of suspicion required for an investigatory stop is considerably less than proof of wrongdoing by a preponderance of the evidence." *Urioste*, 2002–NMSC–023, ¶ 10, 132 N.M. 592, 52 P.3d 964 (internal quotation marks and citation omitted).

■ {13} Reasonable suspicion depends on the reliability and content of the information possessed by the officers. *State v. Contreras*, 2003–NMCA–129, ¶ 5, 134 N.M. 503, 79 P.3d 1111. In our case, reasonable suspicion for the investigatory stop of Defendant rested on a tip provided by a named source who wanted his identity kept confidential. The reliability of a tip from a named source can be gauged more readily than a tip from an anonymous source because the veracity of the anonymous person is "unknown and unknowable." *Urioste*, 2002–NMSC–023, ¶ 7, 132 N.M. 592, 52 P.3d 964 (internal quotation marks and citations omitted). In *Urioste*, our Supreme Court analyzed the tip as anonymous because the state presented no evidence that the information came from a known source whose reputation could be examined and who could be held responsible if the information was false. *Id.* ¶ 8. Here, however, an officer testified that the informant identified himself to Detective Aguilar and that Detective Aguilar identified the informant to the Clovis police when Detective Aguilar relayed the tip. Thus, we analyze the tip's reliability in light of the fact that the officers knew the identity of the informant at the time the officers stopped Defendant. The informant, because he identified himself to Detective Aguilar, could have been held accountable if the information was false. We conclude that the tip regarding Defendant was more reliable than an anonymous tip.

■ {14} Moreover, an informant's ability to predict a person's future behavior demonstrates a "special familiarity" with that individual's affairs. *Id.* ¶ 11 (internal quotation marks and citation omitted). This familiarity is an indication that the informant has access to reliable information about a person's illegal activities. *Id.* When significant aspects of the information are verified, an officer can reasonably believe in both the reliability of the information and the informant's veracity. *Id.* Thus, the defendant's movement through time is the most important factor in assessing whether an officer's suspicion based on an informant's tip is reasonable. *Id.* ¶ 14.

If the tipster can be said to be in on an action that is taken by the suspect in the future, from the point of view of the time the tip is given, then as a matter of law, the asserted illegality can be associated with the prediction so as to increase the reliability of the tip.

*Id.* Finally, in determining "whether enough facts were corroborated beyond the basic and important future movement factor," we compare the number and type of corroborated facts to those in previous cases in which courts have held that the corroborated facts rose to the level of reasonable suspicion. *Id.* ¶ 15.

{15} The tip in the case here is more reliable than the tip in *Urioste*. In *Urioste*, the police received a tip at approximately 4:30 p.m. *Id.* ¶ 2. The informant described the vehicle, driver, route, and time of the defendant's movement in the future. *Id.* Our Supreme Court concluded that the accurate prediction of the defendant's future movement in time and place, combined with the other facts in the tip that were corroborated by the officer, was sufficient to provide reasonable suspicion. *Id.* ¶¶ 14–15.

{16} Our case is very similar to *Urioste*. The tip correctly predicted Defendant's future movement. The officers corroborated Defendant's future movement when they followed the vehicle that she was driving to within two and a half blocks of the destination provided by informant. The officers also corroborated the description of the vehicle, including the personalized license plate. Defendant argues that the absence of her husband from the vehicle was an indication that the tip was not reliable. However, it was reasonable for the officers to believe that the husband was present in the vehicle prior to the stop because they were following a vehicle that had two occupants. *See Florida v. J.L.*, 529 U.S. 266, 271, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000) ("The reasonableness of official suspicion must be measured by what the officers knew before they conducted their search.").

{17} Defendant argues that the tip in her case is more like the tip found to be insufficient in *J.L.* than the tip found to be sufficient in *Urioste*. *See J.L.* at 268, 120 S.Ct. 1375 (concluding that an anonymous tip, which merely identified the defendant as a

young African–American male who was wearing a plaid shirt, standing at a specific bus stop, and carrying a gun, was insufficient to create reasonable suspicion); *see also Morales,* 2005–NMCA–027, ¶¶ 1–2, 137 N.M. 73, 107 P.3d 513 (holding that an anonymous tip was unreliable when it reported that two individuals, in a blue vehicle at a specific intersection, were acting suspiciously and were possibly armed). We disagree. The tip in *J.L.* merely described a "status quo," and the officers in that case did not observe the defendant moving in accordance with the tip. *Urioste,* 2002–NMSC–023, ¶ 13, 132 N.M. 592, 52 P.3d 964 ("It is much more difficult to form a reasonable suspicion when only a status quo is reported to police and that is all they see."); *see also J.L.,* 529 U.S. at 271–72, 120 S.Ct. 1375. The officers in our case observed the future movements of Defendant in accordance with the tip when they followed the specifically described vehicle to within two and a half blocks of the reported destination.

{18} Defendant also alleges that the tip was inherently unreliable because the informant was an acquaintance of Defendant's and, seeking revenge, set her up. Defendant presents no evidence that the officers were aware of any relationship between the informant and Defendant at the time of the tip and the subsequent investigatory stop. Thus, even if these allegations are true, the reasonableness of the stop and detention is not affected. *See J.L.,* 529 U.S. at 271, 120 S.Ct. 1375.

{19} We conclude that the tip was sufficiently reliable and complete because the identity of the informant was known to the officers and because significant aspects of the tip, including Defendant's future movement, were corroborated by the officers prior to the stop. Under the totality of these circumstances, the tip provided specific articulable facts, corroborated by the officers, that were sufficient to give the officers reasonable suspicion that Defendant was in possession of narcotics. *See State v. Flores,* 1996–NMCA–059, ¶ 7, 122 N.M. 84, 920 P.2d 1038 ("Reasonable suspicion must be based on specific articulable facts and the rational inferences that may be drawn from those facts."); *cf.*

*Contreras,* 2003–NMCA–129, ¶ 5, 134 N.M. 503, 79 P.3d 1111 ("Because the facts surrounding the anonymous tip and investigatory stop are viewed in light of the totality of the circumstances, a deficiency in one consideration can be compensated for by the strength in another consideration or by some indicia of reliability."). Our resolution of the first issue leads us to the second question regarding an investigatory stop: "whether it was reasonably related in scope to the circumstances which justified the interference in the first place." *Terry,* 392 U.S. at 20, 88 S.Ct. 1868.

### D. Scope of the Stop

{20} Defendant argues that detaining the vehicle was an unreasonable seizure that required probable cause. Existing law provides no support for Defendant's position. "An officer who makes a valid investigatory stop may briefly detain those he suspects of criminal activity to verify or quell that suspicion." *Werner,* 117 N.M. at 317, 871 P.2d at 973 (using *Terry* and subsequent related cases to examine a de facto arrest). The United States Supreme Court applied the principles of *Terry* to the seizure of property in *United States v. Place,* 462 U.S. 696, 706, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983) ("[T]he principles of *Terry* and its progeny . . . permit the officer to detain the luggage briefly to investigate the circumstances that aroused his suspicion, provided that the investigative detention is properly limited in scope."). If the nature and extent of the detention minimally intrude on an individual's Fourth Amendment interests, "opposing law enforcement interests can support a seizure based on less than probable cause." *Id.* at 703, 103 S.Ct. 2637. Only when a detention exceeds the limits of a permissible investigatory stop does the detention require probable cause. *Flores,* 1996–NMCA–059, ¶ 15, 122 N.M. 84, 920 P.2d 1038. We use "common sense and ordinary human experience" to determine whether the detention violates Fourth Amendment protections. *Werner,* 117 N.M. at 317–18, 871 P.2d at 973–74 (internal quotation marks and citation omitted).

{21} There are several factors that must be considered when we determine whether the scope of an investigatory stop is permissible: the government's justification for the detention, the character of the intrusion on the individual, the diligence of the police in conducting the investigation, and the length of the detention. First, in determining whether there is a reasonable justification for the detention, we balance the government's justification for the official intrusion against the character of the intrusion on a person's right to be free from police interference. *Id.* at 318, 871 P.2d at 974; *see also Contreras,* 2003–NMCA–129, ¶ 13, 134 N.M. 503, 79 P.3d 1111 (weighing "the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty"). Thus, we balance the government's interest in preventing the use and distribution of methamphetamine against Defendant's right to be free from official investigation through the use of a drug dog. *Cf. Contreras,* 2003–NMCA–129, ¶ 13, 134 N.M. 503, 79 P.3d 1111 (balancing "the possible threat of drunk driving to the safety of the public with [the d]efendant's right to be free from unreasonable seizure").

{22} The government has a significant interest in preventing the use and distribution of an illegal substance, such as methamphetamine. *See Place,* 462 U.S. at 703, 103 S.Ct. 2637 (discussing the government's substantial interest in seizing luggage to investigate a reasonable belief that the luggage contains narcotics). As to the type of intrusion, use of a drug dog to conduct a narcotics investigation is a minimal intrusion. *Id.* at 707, 103 S.Ct. 2637 ("We are aware of no other investigative procedure that is so limited both in the manner in which the information is obtained and in the content of the information revealed by the procedure."); *see also Illinois v. Caballes,* 543 U.S. 405, 409, 125 S.Ct. 834, 160 L.Ed.2d 842 (2005) (stating that the use of a drug dog during a lawful stop "generally does not implicate legitimate privacy interests"). Thus, the government's interest in deterring methamphetamine use, coupled with its general interest in effective crime prevention and detection, substantially outweighs the minimal intrusion on Defendant's liberty through the use of a drug dog.

{23} Second, the scope of the search and seizure must be justified by and limited to the circumstances that created reasonable suspicion for the stop. *Terry,* 392 U.S. at 17–19, 88 S.Ct. 1868. "[A]n investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop." *Florida v. Royer,* 460 U.S. 491, 500, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983). Relying on *State v. Prince,* 2004–NMCA–127, 136 N.M. 521, 101 P.3d 332, Defendant argues that the scope of the stop was impermissibly expanded because "[o]fficers may not use a lawful stop to fish for evidence of other crimes where there is insufficient reason to detain a defendant beyond the purpose of the initial detention." *See id.* ¶ 19. We emphasize the fact that the officers did not make a traffic stop; rather, they made a stop to investigate their reasonable suspicion with respect to the possession and distribution of methamphetamine. Thus, Defendant's reliance on *Prince* is misplaced because the stop in *Prince* was for a traffic violation. *See id.* ¶ 11. As discussed earlier, the officers in our case had reasonable suspicion to make an investigatory stop regarding Defendant's possession of methamphetamine. Further, the vehicle was detained to effectuate the purpose of the stop—to quickly confirm or dispel the officers' suspicions, regarding methamphetamine, by using a drug dog. *See Carter v. State,* 143 Md.App. 670, 795 A.2d 790, 801 (Ct.Spec.App.2002) ("The *Terry*-stop in this case was from the outset an investigation into a suspected narcotics violation. The use of a drug-sniffing canine was in the direct service of that purpose and was not a gratuitous investigative technique hoping to piggyback on an unrelated traffic stop.").

{24} Defendant further argues that her detention was unlawful, in light of *Flores,* because the investigatory stop must come to an end when the initial suspicion of illegal conduct is dispelled. *See Flores,* 1996–NMCA–059, ¶ 13, 122 N.M. 84, 920 P.2d 1038 ("Once the officers failed to uncover any drugs at the roadside stop, the very rationale for the stop, to verify or quell ... suspicion, was exhausted." (internal quotation marks

and citation omitted)). *Flores* is distinguishable from the case at hand. There were two seizures in *Flores*. *Id.* ¶ 12. At the initial stop, the roadside search took about an hour. *Id.* ¶ 4. During that time, the defendant consented to a search of his vehicle. *Id.* ¶ 3. In the resulting search, officers failed to find any drugs, and a narcotics dog failed to alert to the presence of any drugs. *Id.* This Court concluded that the initial detention was lawful because "the methods used by the officers at the roadside were designed to verify or dispel their suspicions." *Id.* ¶ 11 (internal quotation marks and citation omitted). After the roadside search, the police moved the vehicles and drivers to a warehouse for an exhaustive search, lasting two to three hours. *Id.* ¶ 12. Because the officers' suspicions had been quelled at the roadside stop, the reasonableness of the investigatory stop ended after the first search. *Id.* ¶ 13.

{25} In the roadside stop in our case, the officers' suspicions were not dispelled after the initial questioning of Defendant; thus, additional articulable facts were not necessary to justify the detention of the vehicle. Defendant was extremely nervous during the initial questioning. After she denied consent to search, the officers requested a drug dog to quickly confirm or dispel their continuing suspicions. Within forty minutes after the officers stopped the vehicle and tried to obtain consent, the canine unit arrived, and the dog alerted to the illegal substances within Defendant's vehicle. It was only after the dog arrived and alerted to the illegal substances that there was any resolution to the officers' suspicions.

{26} Moreover, Defendant asserts that she exhibited no unlawful conduct that would justify detention of the vehicle. This argument also fails. Notwithstanding the fact that reasonable suspicion already existed, based on the tip, we note that reasonable suspicion "can arise from wholly lawful conduct." *Urioste*, 2002–NMSC–023, ¶ 10, 132 N.M. 592, 52 P.3d 964 (internal quotation marks and citations omitted).

{27} Although the State contends that Defendant did not clearly address the temporal scope of the stop, we read her brief to challenge the length of the detention. Because the duration of a stop is a factor in determining reasonableness, we consider Defendant's argument. *See Van Dang*, 2005–NMSC–033, ¶¶ 14–16, 138 N.M. 408, 120 P.3d 830 (reviewing the totality of the circumstances, including duration and scope of questioning, to determine whether the detention was justified). "[T]he brevity of the invasion ... is an important factor ..., [and] in assessing the effect of the length of the detention, we take into account whether the police diligently pursue their investigation." *Place*, 462 U.S. at 709, 103 S.Ct. 2637 (concluding that the police "had ample time to arrange for their additional investigation at that location, and thereby could have minimized the intrusion on respondent's Fourth Amendment interests"); *Werner*, 117 N.M. at 319, 871 P.2d at 975 ("Diligence in the investigation is key[.]").

{28} In *Werner*, the scope of the detention violated the defendant's Fourth Amendment rights when, fifteen to twenty minutes after the initial stop, he was moved to the back seat of a locked patrol car, where he remained for more than forty-five minutes. 117 N.M. at 318, 871 P.2d at 974. The officer told the defendant that he could not leave or move his car. *Id.* His freedom of movement was thereby severely limited. *Id.* ("[A] reasonable person in Werner's position would have felt deprived of his freedom in a significant way."). Our Supreme Court concluded that this was a significant intrusion, which outweighed the government's interest in preventing flight and destruction of evidence. *Id.* at 318–19, 871 P.2d at 974–75. Moreover, the Court concluded that the police did not act with diligence because they detained the defendant while "awaiting the development of circumstances off the scene." *Id.* at 319, 871 P.2d at 975 ("If authorities, acting without probable cause, can seize a person, hold him in a locked police car for over forty-five minutes while gathering witnesses, and keep him available for arrest in case probable cause is later developed, the requirement for probable cause for arrest has been turned upside down.")

{29} The investigatory stop in our case is decidedly different from that in *Werner*. First, Defendant's freedom of movement was

not severely restricted. Defendant was told she was free to leave, and she did so. Second, as discussed earlier, the government's substantial interest in preventing the use and distribution of methamphetamine outweighs the minimal intrusion that occurs with the use of a drug dog. Finally, the officers clearly acted with diligence. The record reveals that after Defendant refused consent to search, the officers immediately requested the assistance of a drug dog. The canine unit arrived within thirty-five to forty minutes after the officers stopped the vehicle and tried to obtain consent. A delay of this duration is not unreasonable when the off-duty officer on call with the drug dog lived approximately ten miles, seventeen minutes travel time, from the stop. *See United States v. Bloomfield,* 40 F.3d 910, 917 (8th Cir.1994) ("When police need the assistance of a drug dog in roadside *Terry* stops, it will in general take time to obtain one; local government police forces and the state highway patrol cannot be expected to have drug dogs immediately available to all officers in the field at all times."); *Van Dang,* 2005–NMSC–033, ¶¶ 3, 15, 16, 138 N.M. 408, 120 P.3d 830 (concluding that the duration of the detention was proper because it resulted from the officer's legitimate attempts to contact the rental agency and took no longer than necessary). Finally, the officers' use of a drug dog was a means of investigation that would dispel or confirm their suspicions quickly. *State v. Graves,* 119 N.M. 89, 94, 888 P.2d 971, 976 (Ct.App.1994) ("In examining whether a detention is reasonable under the circumstances, a court must determine ... whether the officers diligently pursued a means of investigation that would dispel or confirm their suspicions quickly." (internal quotation marks and citation omitted)).

{30} Other jurisdictions have concluded that similar detentions of people or property are reasonable when an off-site drug dog has been summoned to investigate reasonable suspicion of drug crimes. *See United States v. White,* 42 F.3d 457, 460 (8th Cir.1994) (an hour-and-twenty-minute stop); *Bloomfield,* 40 F.3d at 917 (a one-hour stop); *United States v. French,* 974 F.2d 687, 690, 692 (6th Cir.1992) (drug dog called from fifty miles away); *United States v. Mondello,* 927 F.2d 1463, 1471 (9th Cir.1991) (a thirty-minute stop); *United States v. Sterling,* 909 F.2d 1078, 1081 (7th Cir.1990) (an hour-and-fifteen-minute detention of property); *United States v. Hardy,* 855 F.2d 753, 761 (11th Cir.1988) (a fifty-minute stop); *Cresswell v. State,* 564 So.2d 480, 481, 483 (Fla.1990) (a fifty-minute stop); *State v. Brumfield,* 136 Idaho 913, 42 P.3d 706, 710 (Ct.App.2001) (a forty-nine-minute stop); *State v. Gant,* 637 So.2d 396, 397 (La.1994) (per curiam) (a thirty-minute stop); *Carter,* 795 A.2d at 805 (a thirty-five-minute stop).

## III. CONCLUSION

{31} Based on the tip provided by a named informant, the officers had reasonable suspicion that Defendant had or was engaged in criminal conduct because the tip accurately predicted the future movement of Defendant and because other significant aspects of the tip were corroborated by the officers. Moreover, detention of the vehicle for thirty-five to forty minutes to await a canine unit was within the permissible scope of the investigatory stop; the officers acted diligently, with minimal intrusion, to verify or dispel their reasonable suspicion that Defendant was in possession of methamphetamine with the intent to distribute. Therefore, we affirm the district court's denial of Defendant's motion to suppress evidence.

{32} **IT IS SO ORDERED.**

WE CONCUR: A. JOSEPH ALARID and CYNTHIA A. FRY, Judges.