This memorandum opinion was not selected for publication in the New Mexico Appellate Reports. Please see Rule 12-405 NMRA for restrictions on the citation of unpublished memorandum opinions. Please also note that this electronic memorandum opinion may contain computer-generated errors or other deviations from the official paper version filed by the Court of Appeals and does not include the filing date.

# IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

**STATE OF NEW MEXICO,**

Plaintiff-Appellee,

v.                                                                                    **NO. 33,401**

**THOMAS CUNNINGHAM,**

Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF BERNALILLO COUNTY**
**Judith K. Nakamura, District Judge**

Hector H. Balderas, Attorney General
Santa Fe, NM
Walter Hart, Assistant Attorney General
Albuquerque, NM

for Appellee

Jorge A. Alvarado, Chief Public Defender
Becca Salwin, Assistant Appellate Defender
Santa Fe, NM
Vicki W. Zelle, Assistant Appellate Defender
Albuquerque, NM

for Appellant

**MEMORANDUM OPINION**

**BUSTAMANTE, Judge.**

{1}     Thomas Cunningham (Defendant) appeals the district court's denial of his motion to suppress evidence on the ground that there was no reasonable suspicion to support the investigatory detention that led to evidence against him. We conclude that the officer's detention of Defendant was based on reasonable suspicion and therefore affirm. We also decline Defendant's invitation to remand for a new trial based on his claim of ineffective assistance of counsel.

**BACKGROUND**

{2}     At approximately 10 p.m. on April 4, 2012, Officer Chris Luttrell was on patrol near a shopping center at San Mateo and Zuni in Albuquerque, New Mexico. The back of the shopping center faces Acoma Street. Between the back of the shopping center and Acoma Street there is an open area in which there were loading docks and dumpsters. The area is separated from Acoma Street by a curb. Officer Luttrell was driving westbound in a black, unmarked Crown Victoria with the lights off when he observed a pickup truck parked next to a dumpster behind the shopping center. Officer Luttrell testified that it was "very dark" behind the shopping center and that there were no businesses open either in the shopping center or across the street from where the truck was parked, except for possibly a "pizza place" that had "its own lighted area parking" that was closer to the store's entrance than where the truck was parked. Defendant and another man (Valentine Romero) were sitting in the cab of the truck,

with Defendant on the passenger side. A third man was standing next to the open passenger door interacting with the occupants of the truck. Officer Luttrell testified that he "c[a]me drifting down" toward the truck with his lights off because he "like[d] to drive right up on people and catch them in the act." When he was approximately thirty feet from the truck, Officer Luttrell turned on the police car's spotlight. As he did so, he observed a "hand-to-hand," which he described as "when I'm going to give you cash for some sort of illicit drugs and we pass to each other."

{3} Shortly after turning on the spotlight, Officer Luttrell approached the passenger side of the truck on foot. At some point, either while still in the police car or while walking toward the truck, Officer Luttrell saw Defendant shove a black bag down toward his feet. As Officer Luttrell walked toward the truck, the man standing at the passenger side door noticed him and "t[ook] off northbound [at] a high pace." Officer Luttrell identified himself as a police officer and told the truck occupants to keep their hands where he could see them. Officer Luttrell was armed and wearing a uniform that identified him as a police officer. He asked who owned the black bag at Defendant's feet. Both Defendant and Romero denied ownership of the bag.

{4} During the discussion of the bag's ownership, Officer Luttrell observed a "long, thin crack pipe sticking up and out" of the bag. After seeing the pipe, Officer Luttrell "got [Defendant] out, placed him in cuffs and put him under arrest." Officer Luttrell also found marijuana, heroin, and other drug paraphernalia in the bag. He then

"pat[ted Defendant] down," put Defendant in the police car, and took him to the prisoner transport center. At the prisoner transport center, Officer Luttrell watched as another officer was preparing Defendant for booking by removing Defendant's belt. During this process, a baggie, later determined to contain crack cocaine, dropped from Defendant's waist area.

{5} Defendant was charged with possession of cocaine, as well as possession of marijuana, heroin, and drug paraphernalia. His motion to suppress the evidence obtained from the truck and at the prisoner transport center based on a lack of reasonable suspicion for his detention was denied.

{6} Defendant was convicted by a jury on all counts. He now appeals, arguing that the district court erred in denying his motion to suppress.

**DISCUSSION**

**Defendant's Right to be Free From Unreasonable Seizures Was Not Violated**

{7} The right to be free from unreasonable searches and seizures, including investigatory detentions, stems from the Fourth Amendment to the United States Constitution and Article II, Section 10 of the New Mexico Constitution. *See* U.S. Const. amend. IV; N.M. Const. art. II, § 10; *State v. Jason L.*, 2000-NMSC-018, ¶ 14, 129 N.M. 119, 2 P.3d 856 ("[I]nvestigatory stops are seizures invoking Fourth Amendment protections[.]"). "An investigatory detention occurs when an officer briefly detains and investigates a person based on reasonable suspicion of criminal

4

activity." *State v. Wilson*, 2007-NMCA-111, ¶ 18, 142 N.M. 737, 169 P.3d 1184. Analysis of the reasonableness of an investigatory detention requires us to answer two questions: at what point did the detention begin, and did the officer have reasonable suspicion at that point to support the detention? *See Jason L.*, 2000-NMSC-018, ¶ 1 (stating that the Court would analyze "(1) when was [the defendant] seized for purposes of his constitutional protections, . . . and (2) was his seizure justified?"). We address these questions in turn.

{8}     "The point at which the seizure occurs is pivotal because it determines the point in time the police must have reasonable suspicion to conduct an investigatory stop." *State v. Harbison*, 2007-NMSC-016, ¶ 10, 141 N.M. 392, 156 P.3d 30. A person is seized when "a police officer accosts an individual and restrains his freedom to walk away." *Jason L.*, 2000-NMSC-018, ¶ 15 (internal quotation marks and citation omitted). "[R]estraint on a person's freedom . . . can be the result of either physical force or a showing of authority." *Id.* To determine whether a person has been seized, we examine "(1) the conduct of the police, (2) the person of the individual citizen, and (3) the physical surroundings of the encounter." *Id.* (internal quotation marks and citation omitted). In doing so, we ask "(1) what were the circumstances surrounding the stop, including whether the officers used a show of authority; and (2) did the circumstances reach such a level of accosting and restraint that a reasonable person would have believed he or she was not free to leave?" *Id.* ¶ 19. The former question

5

is "a factual inquiry, which we review for substantial evidence[,]" whereas the latter "is a legal inquiry, which we review de novo." *Id.*

**{9}** On appeal, Defendant argues that he was seized as soon as Officer Luttrell turned on the spotlight and began to "rapid[ly]" approach the truck. In contrast, the State argues that the investigatory detention began only when Officer Luttrell identified himself as a police officer and ordered Defendant to keep his hands visible. These arguments are consistent with the parties' arguments before the district court.

**{10}** In its denial of Defendant's motion to suppress, the district court stated:

> The [c]ourt finds that Officer Luttrell had reasonable suspicion, based on articulable facts, to stop Defendant on April 4, 2012. Considering the totality of the circumstances, the [c]ourt finds that the following facts supported the [o]fficer's reasonable suspicion to stop [Defendant]: the high-crime nature of the area in which Defendant was parked, the fact that Defendant was parked away from any open businesses, lighted areas, or marked parking spaces, the [o]fficer's observation of a hand-to-hand transaction followed by the quick departure, upon seeing the [o]fficer, of the third party to the transaction, as well as Defendant's furtive movement to hide an item in the car when the [o]fficer approached.

**{11}** The district court did not state explicitly when Defendant was seized. But because the district court included "Defendant's furtive movement" in its statement of facts supporting reasonable suspicion to detain Defendant, we infer that the district court also found that Defendant was detained *after* that movement occurred. In other words, the district court apparently agreed with the State that the investigatory detention did not begin until Defendant knew that the person approaching was a police

6

officer and was told to keep his hands visible. *See Jason L.*, 2000-NMSC-018, ¶ 10 ("All reasonable inferences in support of the district court's decision will be indulged in, and all inferences or evidence to the contrary will be disregarded." (alterations, internal quotation marks, and citation omitted)).

{12}     As already noted, the district court did not make any explicit factual findings about the circumstances surrounding the stop. However, the parties appear to agree on the following facts: (1) it was nighttime and therefore dark in the area behind the shopping center; (2) Defendant and Romero were seated in a truck next to a dumpster behind the shopping center; (3) an unnamed person was standing next to the open passenger door of the truck interacting with the truck's occupants; (4) Defendant was sitting in the passenger seat of the truck; (5) Officer Luttrell approached the truck in his unmarked police vehicle with his lights off; (6) within approximately thirty feet of the truck, Officer Luttrell turned on the police car's spotlight; (7) the person standing next to the truck quickly left the scene; and (8) Officer Luttrell, wearing a uniform identifying him as a police officer, quickly began approaching the truck on foot. Defendant's position is that he was seized at this point. Next, (9) Officer Luttrell saw Defendant push a black bag towards his feet, and (10) announced that he was a police officer as he approached the vehicle and told Defendant to keep his hands visible. The State argues that Defendant was not seized until the latter occurred. These facts are supported by Officer Luttrell's testimony.

{13} Given these facts, we go on to the second step in the seizure analysis: at what point in this sequence would "a reasonable person . . . have believed he or she was not free to leave?" *Id.* ¶ 19. We disagree with Defendant that the turning on of the spotlight and the position of the unmarked car was sufficient to cause Defendant to believe that he was not free to leave at that point. Because the police car was unmarked, there was nothing that indicated to Defendant that it was occupied by a police officer. *Cf. State v. Walters*, 1997-NMCA-013, ¶ 15, 123 N.M. 88, 934 P.2d 282 (holding "there was no show of authority to bring about a stop [where the d]efendant was not even aware he was being followed by the police"). Hence, the mere activation of the spotlight on the unmarked car, by itself, did not constitute a show of authority such that a reasonable person would have felt restrained. *Cf. State v. Garcia*, 2009-NMSC-046, ¶ 41, 147 N.M. 134, 217 P.3d 1032 (holding that the defendant was seized when the officer stopped his marked car close to the defendant, shone the spotlight on him, and told the defendant to stop); *City of Roswell v. Hudson*, 2007-NMCA-034, ¶¶ 13-14, 141 N.M. 261, 154 P.3d 76 (considering use of the spotlight in the totality of the circumstances and holding that a defendant was seized when the police officer was in a marked car and shone his spotlight into the defendant's car and demanded identification); *State v. Baldonado*, 1992-NMCA-140, ¶ 18, 115 N.M. 106, 847 P.2d 751 (holding that there is no seizure when an officer pulls up behind a stopped car and turns on the police car's emergency lights, but

acknowledging that there may be a seizure when other circumstances, such as the officer's demeanor, indicate that the driver is not free to leave). In addition, although Defendant argues that Officer Luttrell's car was positioned such that he would have had to drive over a curb to leave the area, and therefore was seized as soon as Officer Luttrell drove up, the district court apparently found to the contrary, since it determined that there was no seizure until after Officer Luttrell approached the truck on foot and announced his presence. *See Jason L.*, 2000-NMSC-018, ¶ 11 (stating that "as a general rule, we will indulge in all reasonable presumptions in support of the district court's ruling." (alteration, internal quotation marks, and citation omitted)). Finally, Officer Luttrell's approach toward the truck does not constitute a seizure, even though he was wearing a uniform and had a holstered weapon. *State v. Gutierrez*, 2008-NMCA-015, ¶ 9, 143 N.M. 522, 177 P.3d 1096 ("Law enforcement officers generally need no justification to approach private individuals on the street to ask questions.").

{14}     Instead, we agree with the State and the district court that Defendant was seized once Officer Luttrell told Defendant he was a police officer and ordered him to keep his hands visible. *Id.* (stating that a seizure might occur when "the use of language or tone of voice indicat[es] that compliance with the officer's request might be compelled." (internal quotation marks and citation omitted)); *see State v. Murry*, 2014-NMCA-021, ¶ 9, 318 P.3d 180 (stating that "[the d]efendant was seized by

9

police when, after the two officers approached the parked vehicle she was sitting in, [one of the officers] ordered the driver to open his door").

{15} We turn to the question of whether there was reasonable suspicion to detain Defendant. "Under *Terry v. Ohio* and its progeny, police officers may stop a person for investigative purposes where, considering the totality of the circumstances, the officers have a reasonable and objective basis for suspecting that particular person is engaged in criminal activity." *State v. Werner*, 1994-NMSC-025, ¶ 11, 117 N.M. 315, 871 P.2d 971 (internal quotation marks and citation omitted). "A reasonable suspicion is a particularized suspicion, based on all the circumstances that a particular individual, the one detained, is breaking, or has broken, the law." *Jason L.*, 2000-NMSC-018, ¶ 20. Generalized suspicion is inadequate: "The officer's suspicion must rest on specific, articulable facts" relevant to the particular individual stopped. *State v. Robbs*, 2006-NMCA-061, ¶ 12, 139 N.M. 569, 136 P.3d 570. "Reasonable suspicion must exist at the inception of the seizure." *Jason L.*, 2000-NMSC-018, ¶ 20. Because the reasonableness of an investigatory detention is a question of law, we review whether the stop was justified de novo. *Robbs*, 2006-NMCA-061, ¶ 9.

{16} Other than a brief reference to "greater protections" provided by the New Mexico Constitution, Defendant does not address how New Mexico's reasonable suspicion standards differ from those under the Fourth Amendment. We agree that, generally speaking, the New Mexico Constitution provides greater protections against

10

unreasonable searches and seizures than the United States Constitution. *State v. Gomez*, 1997-NMSC-006, ¶ 24, 122 N.M. 777, 932 P.2d 1 ("There is established New Mexico law interpreting Article II, Section 10 more expansively than the Fourth Amendment."). However, Defendant has not identified any authority for the more specific proposition that the reasonable suspicion analysis is more stringent under Article II, Section 10 than under the Fourth Amendment. In the cases to which Defendant cites for their definition of reasonable suspicion, the Courts relied on federal case law or expressly stated that their analysis was based solely on the Fourth Amendment. *See, e.g.*, *State v. Neal*, 2007-NMSC-043, ¶ 17, 142 N.M. 176, 164 P.3d 57; *State v. Urioste*, 2002-NMSC-023, ¶ 10, 132 N.M. 592, 52 P.3d 964. We therefore do not address this argument. *See Harbison*, 2007-NMSC-016, ¶ 26 (stating that "[w]ithout a state constitutional argument presented to the Court of Appeals, . . . that Court was not required to conduct its own interstitial analysis").

{17}     Based on his argument that he was seized when Officer Luttrell turned on the spotlight, Defendant argues that, at the time that he was detained, Officer Luttrell had only a hunch that criminal activity was about to or had occurred, based only on the neighborhood, the time of night, and the fact of the man standing next to the open door. He maintains that these facts are sufficient only to form an "inchoate and unparticularized suspicion," not rising to the reasonable suspicion necessary to justify an investigatory detention. However, since we have concluded that Defendant was

11

seized only when Officer Luttrell announced that he was a police officer and told Defendant to keep his hands visible, we examine whether there was reasonable suspicion *at that point* to detain Defendant.

{18} Defendant relies on two cases to argue that reasonable suspicion was absent. The first is *Neal*, a 2007 case in which an officer observed the defendant, seated in a truck parked outside of a house that was under investigation for drug activity, interact with a person standing next to the driver's side door. 2007-NMSC-043, ¶ 4. Before the officer could approach the truck, the defendant drove away and the officer followed. *Id.* ¶ 5. As he followed, the officer observed that the truck had a cracked windshield and pulled the truck over "for obstruction of driver's view/vehicle in unsafe condition." *Id.* When he walked up to the truck, the officer recognized the defendant as someone "he knew had prior drug-related and assault convictions." *Id.* During the stop, the officer also learned that the man to whom the defendant had been talking was someone the officer knew to be under investigation for drug activity. *Id.* ¶ 7. The officer observed that the defendant was nervous throughout the encounter. *Id.* After the defendant declined consent to search the truck, the officer told the defendant that the truck would be held "until a drug dog arrived to perform a perimeter sniff of it." *Id.* ¶ 8. The defendant left the scene while the officer waited for the dog. *Id.*

{19} The detention of the truck was based on

12

[the officer's] observations of [the d]efendant prior to and during the stop, including his observations of the two men at the truck; his belief that a drug transaction had taken place; [the d]efendant's nervous, fidgety, and agitated demeanor; [the d]efendant's desire to leave; and [the officer's] prior personal knowledge of [the d]efendant's and [the man leaning into the truck's] criminal history.

*Id.* ¶ 9. In a subsequent search of the truck, officers found a loaded weapon and methamphetamine. *Id.* ¶ 11.

**{20}** The district court granted the defendant's motion to suppress the evidence obtained from the truck. *Id.* ¶ 12. On appeal, this Court reversed. *Id.* ¶ 13. Our Supreme Court reversed this Court, holding that "[the officer] lacked the requisite reasonable suspicion to detain [the d]efendant's truck to await a canine sniff." *Id.* ¶ 32. In doing so, our Supreme Court noted that, as to the alleged transaction observed by the officer, "[the officer] could only see that an occupant of the house [under investigation] was leaning into [the d]efendant's truck. He could not see what, if anything, they were doing, aside from talking, and could not hear what they were saying." *Id.* ¶ 27.

**{21}** Defendant also relies on *State v. Carrillo*, an unpublished opinion of this Court. No. 31,251, mem. op. (N.M. Ct. App. Mar. 28, 2013) (non-precedential). There, we affirmed the district court's order suppressing evidence gathered when the defendant was stopped in a Walgreen's parking lot after officers observed the defendant interacting with the occupant of another car at a nearby park. *Id.* ¶¶ 3-4. At the park,

13

an officer had "observed what appeared to be a hand-to-hand transaction that lasted three to four seconds. However, [the officer] did not see what was exchanged." *Id.* ¶ 3. We held that, even though "the police had received complaints from residents about possible narcotics activity in the area," the officers' observations of the defendant were insufficient to provide reasonable suspicion for the stop at Walgreen's. *Id.* ¶¶ 12, 15.

{22}    To the extent that Defendant relies on these cases for the proposition that an alleged "hand-to-hand" is insufficient to provide reasonable suspicion of illegal activity on its own, we note that the alleged "hand-to-hand" here was not the only factor considered by Officer Luttrell. Moreover, the facts here are distinguishable from *Neal* and *Carrillo*, which both involved conduct during the day in public locations. *Neal*, 2007-NMSC-043, ¶ 4 (occurring at approximately 10 a.m., defendant parked on the street in front of a residence); *Carrillo*, No. 31,351, mem. op. ¶ 3, (occurring "shortly before noon," defendant parked at a local park). Here, Defendant was parked in the unlighted, "very dark" loading area of a shopping center at nearly 10 p.m., away from the only business that might have been open at that hour. In addition, upon seeing the officer, the unnamed person standing at the truck quickly walked away, and Defendant attempted to hide the black bag as Officer Luttrell approached. Considering the totality of the circumstances, we conclude that these facts, taken together, gave rise to reasonable suspicion that Defendant was, or was

14

about to be, engaged in illegal activity. *See Neal*, 2007-NMSC-043, ¶ 28 (stating that "our reasonable suspicion determination requires us to assess the totality of the circumstances and precludes . . . a divide-and-conquer analysis in which we view each individual factor or circumstance in a vacuum." (omission in original) (alteration, internal quotation marks, and citation omitted)); *Urioste*, 2002-NMSC-023, ¶ 10 ("A reasonable suspicion of criminal activity can arise from wholly lawful conduct." (internal quotation marks and citation omitted)).

**Defendant Has Failed to Make a Prima Facie Showing of Ineffective Assistance of Counsel**

{23}    Defendant argues that he is entitled to a new trial because his counsel was ineffective. "We review claims of ineffective assistance of counsel de novo." *State v. Dylan J.*, 2009-NMCA-027, ¶ 33, 145 N.M. 719, 204 P.3d 44. We assess such claims using the two-pronged test set out in *Strickland v. Washington*, 466 U.S. 668, 687 (1984). *Dylan J.*, 2009-NMCA-027, ¶ 36. Under this test, the defendant must "show that his counsel's performance was deficient and that the deficient performance prejudiced his defense." *Id.* An attorney is ineffective "if [his or her performance] falls below an objective standard of reasonableness." *Id.* ¶ 37. We indulge a strong presumption in favor of counsel's effectiveness. *Id.* ("We indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that,

under the circumstances, the challenged action might be considered sound trial strategy." (internal quotation marks and citation omitted)).

{24} Generally, "when the record does not contain all the facts necessary for a full determination of the issue, an ineffective assistance of counsel claim is more properly brought through a habeas corpus petition[.]" *Id.* ¶ 39 (internal quotation marks and citation omitted); *see id.* ¶ 41 (stating that "habeas corpus proceedings are the preferred avenue for adjudicating ineffective assistance of counsel claims" (internal quotation marks and citation omitted)). However, upon a prima facie showing of ineffectiveness, this Court may remand for an evidentiary hearing. *Id.* ¶ 39.

{25} Here, Defendant asserts that defense counsel was ineffective because he failed to (1) conduct a pre-trial interview of Romero, the driver of the truck; (2) "work out some immunity deal" to permit Romero to testify at Defendant's trial; or (3) understand that competency to testify as a witness is not the same as competency to stand trial, which led defense counsel's decision to withdraw Romero as a witness.

{26} Defendant's arguments are not supported by the record. Defense counsel stated at the suppression hearing that he had received "in the mail, an affidavit purportedly from . . . Romero." The affidavit's description of the encounter with Officer Luttrell differed substantially from Officer Luttrell's testimony and stated that "[t]he police lied about the events of that night." However, at the suppression hearing, defense counsel stated that "[w]hen we did a witness interview of . . . Romero, he essentially

16

disavowed that affidavit" and that the affidavit would not be submitted into evidence. These statements suggest that Romero was in fact interviewed by defense counsel. In addition, defense counsel did not object to the State's statement that "all parties acknowledge . . . that according to the supposed author of the affidavit and his attorney[,] who stated that [Romero] was ruled incompetent in a few cases and illiterate, that the affidavit was false." Later in the hearing, defense counsel stated that Romero was withdrawn as a witness "because . . . [he is] not competent to stand trial." Even if this reasoning was incorrect, Defendant has not shown that his defense was hindered by the absence of Romero's testimony. First, although on appeal Defendant asserts that Romero's testimony would have "corroborated a different version of the facts" from that presented by Officer Luttrell and provided "powerful exculpatory testimony[,]" there is no evidence in the record indicating the substance of Romero's testimony, other than the disavowed affidavit. Second, given that Romero disavowed the affidavit, we cannot say on direct appeal that defense counsel's decision to withdraw Romero as a witness was not "sound trial strategy." *State v. Paredez*, 2004-NMSC-036, ¶ 14, 136 N.M. 533, 101 P.3d 799 (internal quotation marks and citation omitted).

{27}     We conclude that Defendant has not made a prima facie showing of ineffective assistance of counsel and thus decline to remand to the district court for a new trial or an evidentiary hearing on this issue. Defendant may pursue his ineffectiveness claim

17

in habeas corpus proceedings. *See State v. Cordova*, 2014-NMCA-081, ¶ 16, 331 P.3d 980 (declining to remand for evidentiary hearings and stating that the defendant may initiate habeas corpus proceedings), *cert. denied*, 2014-NMCERT-007, 331 P.3d 980.

**CONCLUSION**

{28}     We conclude that the district court did not err in denying Defendant's motion to suppress evidence. In addition, because Defendant has failed to present prima facie evidence supporting it, we decline to remand for a new trial or an evidentiary hearing on Defendant's ineffectiveness claim.

{29}     **IT IS SO ORDERED.**

_____

**MICHAEL D. BUSTAMANTE, Judge**

**WE CONCUR:**

_____

**RODERICK T. KENNEDY, Judge**

_____

**LINDA M. VANZI, Judge**